No. 40,824

EARL W. DILL, CARL E. FORBES, IRWIN LANGHOVER, R. C. SCOTT, ORRIS R. IRELAND, FRANK F. RAWLEY, and A. P. WRIGHT, *Appellees,* v. EXCEL PACKING COMPANY, INC., and DON KUTILECK, *Appellants.*

(331 P. 2d 539)

Opinion filed November 8, 1958.

*Emmet A. Blaes,* of Wichita, argued the cause, and *W. D. Jochems, J. Wirth Sargent, Roetzel Jochems, Robert G. Braden, J. Francis Hesse, James W. Sargent, Stanley E. Wisdom, Vincent L. Bogart, Cecil E. Merkel, John W. Brimer* and *Harry L. Hobson,* all of Wichita, were with him on the briefs for appellants.

*H. W. Goodwin,* of Wichita, argued the cause, and *Guy L. Goodwin,* of Wichita, was with him on the briefs for appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action by various suburban property owners (plaintiffs-appellees) to enjoin the operation and maintenance of a cattle feed lot in the immediate neighborhood of their homes on the ground that such operation constitutes a nuisance. From a judgment of the lower court which permanently restrained and enjoined the appellants (defendants) from the operation of their cattle feed lot appeal was duly perfected.

The primary question with which this court is confronted is whether a cattle feeding operation carried on in a sparsely populated agricultural area of Sedgwick County constitutes a nuisance under all the facts, circumstances and conditions presented by the record.

The case was tried to the court upon issues made by the pleadings. The plaintiffs allege in substance that "the keeping of large numbers of cattle on the feed lot and there feeding them for the

purpose of fattening them for the market resulted in the accumulation of great quantities of manure and filth; that the prevailing wind in this area is from either the south or the southwest and that the resulting nauseous odors and stench were blown to the north and the northeast, with the result that the homes of the plaintiffs were rendered almost uninhabitable and the plaintiffs have been, and are now, denied the full use and enjoyment of their homes." It was further alleged that all of the plaintiffs except Langhover and Rawley purchased and owned property in the immediate vicinity which was valuable for subdivision and the sale of home sites and that the installation, maintenance and operation of the feed lot have entirely destroyed the former value of the adjoining real property to the north and northeast for subdivision and sale for home sites. Complaint is also made that the drilling of a large number of wells to water the cattle is seriously depleting and threatening the water supply of the plaintiffs; that the feed lot is a menace to health because it furnishes an ideal place for the breeding of flies and mosquitoes which *will* become numerous; and that the feed lot has seriously depreciated the value of the homes owned and occupied by the plaintiffs. For relief plaintiffs requested *permanent injunction*. Defendants interposed a general denial except to admit installation of a feed lot at the location described in the petition. For affirmative defense it was alleged that the best known practices in the industry have been used in the construction, maintenance and operation of the feed lot and that the defendants have complied with the law in all respects.

The findings of fact made by the trial court were incorporated in the journal entry and with minor supplementation will adequately portray the factual picture revealed by the evidence in the record. Proper evaluation of the decision requires that the findings be quoted at length in lieu of a statement of facts. They are as follows:

"No. 1. The Court finds that the plaintiffs, I don't have the exact ownership of these tracts but the Court finds that the plaintiff Earl W. Dill, and that might be, and wife, owns 80 acres in the East Half of the Southwest Quarter of Section 32.

"No. 2. That the Langhover's are buying a 16 acre tract just west of the Dill land, on contract and that the plaintiffs Forbes own 8 acres just west of the south part of the Langhover property.

"No. 3. That the Excel Packing Company, Inc., own 20 acres across the road south in the Northwest quarter of Section 5, and upon which they are conducting a feed lot operation.

"No. 4. That the defendant Don Kutileck, and his family live on the 20 acres and that the defendant Don Kutileck is a partner in the operation of the feed lot with the Excel Packing Company, Inc.

"No. 5. That sometime prior to March of 1943 the Dills purchased their tract and moved on to the tract in March of 1943.

"No. 6. That the Forbes acquired their tract in the early fall of 1953 and improved it between October 1st, 1953 and March 1st, 1954, about which time they moved on to their tract.

"No. 7. That Langhovers acquired their tract in October of 1953.

"No. 8. That the plaintiff, Orris R. Ireland owns a 40 acre tract immediately to the east and adjoining the Excel Packing Company, Inc., tract of 20 acres and he acquired that tract in October, 1952.

"No. 9. That these four plaintiffs have an investment of approximately $105,000 invested in their properties.

"No. 10. That with the exception of the Dill Property, where they have invested approximately $13,000, approximately all of the money was invested in the years of 1952, 1953 and 1954.

"No. 11. That sometime in 1954, the defendant Excel Packing Company Inc., purchased the 29 acres for $22,500. That an additional $4,000 approximately was spent on remodeling the home and redecorating it, and that the balance of $8500 has been spent by the defendant Excel Packing Company for feed boxes, fence posts, water system and the like in building and improving the lots.

"No. 12. That the defendant Don Kutileck moved on to the 20 acre tract in August of 1954 and commenced feeding operations on a small scale.

"No. 13. That in September of 1955, 27 head were on the property and from that it raised to between four and five hundred head in November and December of 1955 and then dropped off down to a low of 287 on January 3rd, 1956; and then increased up to between four and five hundred until the 13th of March, 1956 when it dropped down to—in the summer months—as low as 95 to 99, and at one time between one and two hundred head. Commencing the latter part of July, 1956, it raised from 192 to 440 head; in August 15th 1956, then it jumped to 840 head and continued in the 8 to 9 hundred figures until November 28, 1956, when it dropped off to 770 head.

"No. 14. That the defendants intend to build additional lots to the west of the house and intend to continue to feed cattle on this property.

"No. 15. That the homes of the plaintiffs Forbes and Langhover are to the northwest of the feed lots and that the home of the plaintiff Dill is slightly to the west and north of the feed lots and that the home of plaintiff Ireland is directly east of the feed lots. And the home of Don Kutileck is directly west of the feed lots.

"No. 16. That the prevailing wind during 1955 was from the south.

"No. 17. That during the ten year period from 1939 thru 1948 according to the Weather Bureau record, the prevailing wind was from the SW 7.1%; South 29.2%; Southeast 19%; East 6.1%; and from the West 3.1% of the time.

"No. 18. That the cattle of the defendants are on full feed rations which consist of milo maize, green shelled corn, dehydrated alfalfa, dehydrated corn cobs, pellets and other items.

"No. 19. That this particular 20 acres is adapted well to the operations of a feed lot by the natural contours of the land.

"No. 20. That some pens have been built by the defendants since this lawsuit was filed.

"No. 21. That the plaintiffs caused letters to be written to the defendants in December of 1954, objecting to the installation and operation of a feed lot on this 20 acres.

"No. 22. That part of this 20 acres have been used as a lot commencing in 1924 until 1942 where an average of 100 cattle were fed.

"No. 23. That from 1942 for a period of some five or six years this area was not used for a feed lot. That for some years after that it was used as a feed lot for breeding registered hogs and the raising of pigs to be sold, with a maximum of possibly 80 hogs and pigs at any one time. That these operations had ceased prior to the fall of 1953 when the Forbes and Langhovers purchased their property.

"No. 24. That R. C. Scott owns 10½ acres in the south portion of the Southeast quarter of Section 32 and the West half of the Southeast quarter of Section 32.

"No. 25. That A. P. Wright owns this other property that is shown on Plaintiffs' Exhibit 1.

"No. 26. That prior to September of 1955, when the defendants were feeding very few head of cattle in the feed lot, the odor and flies did not particularly bother the plaintiffs. *That as the number of head of cattle fed in the feed lots increased, the odors became worse. That during the summer of 1956 and the fall of 1956, the flies were much worse than before, and that the year 1956 was an exceptionally dry year; and that the odors from the feed lots became more intensive and more obnoxious in damp, humid weather than in dry weather. That the odor and flies affect the use and enjoyment of the properties of the plaintiffs.*

"No. 27. *That the operation and existence of the feed lots greatly affect the value of the properties of the plaintiffs in that the properties of the plaintiffs are not as valuable as they were at the time of purchase prior to the operation of the feed lot by the defendants.*

"No. 28. *That it is impossible for the defendants to eliminate the odors or to prevent the fly condition, regardless of any known method to eliminate the odors or to eliminate the fly condition.*

"No. 29. That during the time the defendants have operated the feed lots, the cattle owned by the defendants have been in a healthy condition, and there has been no epidemics; and that it is an average kept feed lot.

"No. 30. That the area surrounding the feed lot, and the area in question is primarily agricultural with the exception of a few suburban tracts with homes.

"No. 31. That the defendants, in the operation of the feed lot, have in good faith, requested help from the Wichita Sedgwick County Department of Health and the Livestock Sanitary Commissioners; that they have excluded from their procedures and operations, some procedures which, had they used, would have been profitable to their operations, such as utilization of their lots to near capacity and coupling the cattle feeding with hog feeding." (Emphasis added.)

After the trial court announced its findings of fact and decision, neither the plaintiffs nor the defendants requested the trial court to make the findings of fact more complete or to state them more clearly. The defendants by motion objected to certain findings on the ground that they were not supported by the evidence and urged the trial court to adopt other findings which they submitted, all of which were ruled adversely to the appellants.

The journal entry after setting forth the findings of fact indicated the following conclusions of law:

"No. 1. The Court finds that the plaintiffs do not have an adequate remedy at law, that the defendants will be restrained and enjoined from operating the feed lot on the 20 acres which they are now operating. The Court will grant them a stay of execution until June 1, 1957, conditioned that upon the cessation of operations that the defendants will see that all refuse is removed from the property.

"The costs of the action will be assessed against the defendants."

Judgment was entered in accordance with the foregoing conclusions on the 4th day of January, 1957. Appeal was duly perfected from the judgment, from an adverse ruling on appellants' motion to strike findings of fact and conclusions of law, and from an adverse ruling on appellants' motion for a new trial.

Plaintiffs' Exhibit 1 is reproduced herein to give a visual outline of the location of the respective properties in the vicinity of the cattle feed lot:

Evidence in the record concerning which there is no controversy discloses that this feed lot, with a maximum capacity of 3,000 head of cattle, is located approximately six miles north of the city limits of Wichita, Kansas, on an improved county highway running east and west. It joins U. S. Highway No. 81 less than one mile to the east of the feed lot in question and leads to the town of Valley Center approximately two miles to the west and slightly north of the feed lot. The county commissioners of Sedgwick County pursuant to legislative authorization have zoned an area three miles in radius beyond the outer perimeter of the City of Wichita, but the feed lot in question is several miles beyond the outer extremity of this zoned area and is not subject to zoning by the county commissioners.

At the threshold of any case like this we are confronted with various fundamental rules which must be recognized and reconciled with the decision. Findings of fact made by the trial court based upon conflicting evidence, or having substantial evidence to support

them, are binding on this court and will not be disturbed. It has also been held that in an action tried by the court, which makes findings of fact and conclusions of law, the conclusions of law should be supported by the findings made. (*Hajny v. Robinson Milling Co.,* 156 Kan. 506, 134 P. 2d 398.)

The nuisance doctrine operates as a restriction upon the right of an owner of property to make such use of it as he pleases, and is

applied to that class of wrongs which arise from the unreasonable, unwarrantable or unlawful use by a person of his own property which produces such material annoyance, inconvenience, discomfort or hurt that the law will presume a consequent damage. (66 C. J. S., Nuisances, § 1 a, pp. 727, 728.)

Nuisances fall into two categories—nuisance *per se* and nuisance *per accidens* or nuisance in fact. A nuisance *per se* is an act, occupation or structure which is a nuisance at all times and under any circumstances. A nuisance *per accidens* or nuisance in fact is that which becomes a nuisance by reason of circumstances surrounding. (66 C. J. S., Nuisances, § 3, p. 733.) Obviously, the operation of the feed lot in the instant case, to constitute a nuisance must be shown by the evidence to fall within the latter definition by reason of the use made of the premises. This court defined a nuisance in *Steifer v. City of Kansas City,* 175 Kan. 794, 267 P. 2d 474, in the following language:

". . . Nuisance means annoyance, and any use of property by one which gives offense to or endangers life or health, violates the laws of decency, unreasonably pollutes the air with foul, noxious, offensive odors or smoke, or obstructs the reasonable and comfortable use and enjoyment of the property of another, may be said to be a nuisance. What may or may not constitute a nuisance in a particular case depends upon many things, such as the type of neighborhood, the nature of the thing or wrong complained of, its proximity to those alleging injury or damage, its frequency or continuity, and the nature and extent of the injury, damage or annoyance resulting. Each case must, of necessity, depend upon particular facts and circumstances . . ." (p. 798.)

Reference is made to *Hofstetter v. Myers, Inc.,* 170 Kan. 564, 228 P. 2d 522, 24 A. L. R. 2d 188, where the law concerning nuisances has been well stated and discussed. There the court said that dust which substantially interferes with the comfortable enjoyment of adjacent premises constitutes a nuisance, provided it is sufficient to cause perceptible injury to persons or property, but reversed the trial court on the ground that its findings did not support the conclusion that a nuisance existed.

For a person to avail himself of the equity powers of the court to enjoin a party lawfully using his own property, such person must clearly show that he comes within that class of persons being deprived of that use and enjoyment of property through the activities of another. Thus, where it is alleged that a thing is a nuisance in fact, proof of the act and its consequences is necessary. The act or thing complained of must be shown by evidence to be a

nuisance under the law and whether it is or is not a nuisance is generally a question of fact. We must, therefore, carefully examine the findings of fact made by the trial court in order to ascertain whether the facts as found are sufficient as a matter of law to constitute the operation of appellants' feed lot a nuisance in fact and subject to abatement.

While the appellants contend that Finding No. 27 is not supported by the evidence, a careful examination of the record discloses the objection to this finding is without merit. This finding when viewed under the allegations of plaintiffs' petition may be said to be ambiguous. Resort to the record, however, quickly discloses that evidence concerning the value of plaintiffs' properties for subdivision purposes was insufficient in that it failed to disclose (1) a source of water supply for residential development, (2) any utility or sewer connections except electricity, or (3) any indication that properties in this vicinity were sought by real estate men for development purposes. When it is considered as a general finding relative to the homes situated in the immediate vicinity of the feed lot it is supported by evidence to which no objection appears to have been made at the trial.

The question, therefore, resolves into whether the conclusion that the operation of appellants' cattle feed lot constituted a nuisance, and the judgment ultimately rendered thereon, have any basis in or are supported by the findings.

Whether a nuisance is established must be determined from Findings No. 26, No. 27 and No. 28 (italicized). They are the crucial findings which have a direct bearing on the subject.

Appellants argue that the trial court did not find the operation of the feed lot constituted a nuisance, and that the findings of fact made by the trial court are insufficient as a matter of law to amount to a nuisance. Actually whether the trial court used the term "nuisance" in making its findings is immaterial. The use of the term at best would be a mere conclusion. We must look to the facts established. It is only fair to infer that the trial court concluded a nuisance existed as a matter of fact upon the findings it made when it concluded that the plaintiffs did not have an adequate remedy at law and permanently enjoined appellants from operating their feed lot at the particular location.

Findings of the trial court should be construed so as to uphold rather than defeat the judgment. That is, they must be given a

liberal construction. (53 Am. Jur., Trial, § 1145, p. 798; see, also, 89 C. J. S., Trial, § 646, p. 484.)

If the trial court had omitted Finding No. 27, it could be said that the instant case is closely analogous to *Hofstetter v. Myers, Inc.*, supra, and controlled thereby. Appellees are quick to assert that the missing element in the *Hofstetter* case has been supplied by the trial court in Finding No. 27.

In the *Hofstetter* case the findings disclosed that dust from the occasional operations of a portable hot asphalt mixing plant was blown onto plaintiffs' properties *only* when the direction and velocity of the wind were right, that is, blowing sufficiently strong from a general southwesterly direction, and that when such conditions prevailed plaintiffs were *inconvenienced* thereby. This court then gratuitously added:

"Now it may be that plaintiffs suffered actual injury and damage to their persons and property as a result of the plant's operation, but the fact remains the lower court did not so find! It merely found they were *inconvenienced!* While it is perhaps true that 'inconvenience,' depending upon its nature, extent and result, might, in some instances, be such as to constitute a nuisance in the eyes of the law, yet under all of the facts and circumstances of the case before us we cannot give the court's findings such interpretation." (p. 569.)

It is entirely possible, since each nuisance case must stand upon its own particular facts and circumstances, that had the trial court found the plaintiffs sustained damage to their property in the *Hofstetter* case, the trial court may still have been reversed on the ground that its findings did not sustain the conclusion that a nuisance existed which was subject to abatement.

In the instant case the only relief sought by the plaintiffs is to abate the alleged nuisance. They requested a permanent injunction. They *did not seek damages* and a permanent injunction for the alleged nuisance as did the plaintiffs in *Steifer v. City of Kansas City*, supra.

Where the operation of a business, such as a cattle feeding operation in the instant case, is lawful in the first instance—that is, it does not constitute a nuisance *per se—unless the circumstances disclose that it is in fact a nuisance*, its continuance may not be enjoined upon the ground that the value of adjoining property is depreciated. (See *Vanderslice, et al., v. Shawn, et al.*, 26 Del. Ch. 225, 27 A. 2d 87; and 66 C. J. S., Nuisances, § 111, pp. 870, 876.) This must be the law, since environmental factors invariably affect the value of property. Only the occasional environmental factor

which depreciates the value of property falls within the category of a nuisance. Proof, therefore, that the value of property has been depreciated by an environmental factor is not proof that such environmental factor is a nuisance.

The most direct statement of the trial court in the findings bearing upon the question of nuisance is: "That the odor and flies affect the use and enjoyment of the properties of the plaintiffs." Liberally construed, it must be added that the trial court intended to indicate that the plaintiffs were adversely affected.

It may be generally stated that a court of equity will not inter- fere to prevent or abate as a nuisance everything which may work hurt, inconvenience or damage; but in order to call for such inter- ference it must appear that the injury resulting from the alleged nuisance is or will be irreparable. So a mere diminution of the value of property by a nuisance, without irreparable mischief, will not furnish sufficient ground for equitable relief by injunction. (See *City of Lakeland v. State ex rel.*, 143 Fla. 761, 197 So. 470.) See, also, *Bielman v. The Chicago, St. P. & K. C. Ry. Co.*, 50 Mo. App. 151, where the measure of damages in a nuisance action is dis- cussed, and *Steifer v. City of Kansas City*, supra.

This court is confronted with a direct finding of the trial court (Finding No. 30) that the area surrounding the feed lot, and the area in question, is *primarily agricultural* with the exception of a few suburban tracts with homes. We are also confronted with Findings No. 29 and No. 31. Actually the finding of the court that the feed lot in question was an "average kept" feed lot was a finding based upon evidence most favorable to the appellees. For example, while the testimony of Dr. Ray S. Pyles, State Veterinarian with the Livestock Sanitary Commissioner's office, cannot be consid- ered upon review of this case, he testified as follows concerning his visit on November 14, 1956:

"Q. Now would you please relate to the court your findings on that visit?

"A. Well, I can say without exception, that it was the most sanitary and best located feed lot that I have ever visited in the State of Kansas. I was highly impressed with the drainage and the sanitation that I saw in this particular location and I made remarks to that effect that certainly as a feed lot I could find nothing that would be unsanitary or objectionable.

"Q. You, of course, had occasion to smell the premises while you were there, did you not?

"A. I took that into consideration, yes.

"Q. In your opinion, was the odor offensive?

"A. To me, there was no offensive odor the day I was there.

"Q. There has been testimony here that this is a particularly offensive location and operation, and since you have occasion to see the various lots around the State, how does this particular one compare to most feed lots?

"A. As I made the previous statement, this is the cleanest feed lot that I have seen in my entire visits in the State of Kansas."

The prime factor which gives us pause in resolving this case is the location at which the operation of the feed lot is conducted. It is an "average kept" feed lot in an area primarily agricultural with the exception of a few suburban tracts with homes. The trial court specifically found the operation was conducted in good faith with help requested from the Wichita-Sedgwick County Sanitary Commissioner. To assist in sanitation and the control of odors the feed lot was stocked to less than one-third of capacity and hogs were not fed behind the cattle, although it would have been more profitable to have stocked more cattle in the lot and coupled hog feeding with the cattle feeding. ·

Obviously, the feeding of livestock *in any number* within the limits of a residential area would be a nuisance. In fact, ordinances have been passed by cities to prevent the maintenance of poultry and livestock within the city limits. What may be a nuisance in one location and subject to abatement may not be a nuisance, however, in another location. The question may be seriously posed: Where can cattle be fed if not in a sparsely populated area which is primarily agricultural? Are cattle feeders to be forced many miles from the cities when the packing plants which slaughter these cattle are located at the cities and provide employment for numerous city dwellers?

The issue before the court in the *instant case* is limited, and our attention is focused upon those elements which, when examined in the light of legitimate use of property, constitute an unreasonable use of that property amounting to a nuisance subject to abatement. (*Helms v. Oil Co.*, infra.)

In *Helms v. Oil Co.*, 102 Kan. 164, 169 Pac. 208, the court said:

"Whether or not a use which in itself is lawful is a nuisance depends upon a number of circumstances—locality and surroundings, the number of people living there, the prior use, whether it is continual or occasional, and the extent of the nuisance and injury caused to the neighbor from the use. If the injury is slight and trivial and occurs in the development of the natural resources of the land it is not deemed to be unreasonable. . . ." (p. 168.)

Plaintiffs in the instant case are affected in varying degrees depending upon the direction in which they live from the cattle feed lot in question. Each is annoyed by the odor from this feed lot operation when the wind blows in the particular direction in which

he is located from the feed lot. No one single person is affected all the time. Upon the findings when the wind blows from the south or southwest, which is 36.3% of the time, the odors drift over open farm land. When the wind blows from the southeast, which is 19% of the time, the Dills, Langhovers and Forbes are annoyed, assuming that the weather conditions are right to cause odors which affect the use and enjoyment of their homes. The few others would be annoyed far less.

The history of the area, disclosed in the findings, shows the premises in question to have been used for feeding an average of 100 head of cattle from 1924 to 1942 (Finding No. 22). Also that for some years after 1948 many hogs were raised and fed on the premises (Finding No. 23).

Admittedly, in an agricultural area where cattle are fed it is practically impossible to eliminate completely the odors and flies from an operation such as conducted by appellants, since it is of necessity a day to day operation where the materials causing the odors are being continually deposited in the area. Finding No. 28, therefore, has little significance since in agricultural areas where any cattle are kept, or other livestock for that matter, it is impossible to eliminate odors or prevent a fly condition completely.

Plaintiffs chose to live in an area uncontrolled by zoning laws or restrictive covenants and remote from urban development. In such an area plaintiffs cannot complain that legitimate agricultural pursuits are being carried on in the vicinity, nor can plaintiffs, having chosen to build in an agricultural area, complain that the agricultural pursuits carried on in the area depreciate the value of their homes. The area being *primarily agricultural,* any opinion reflecting the value of such property must take this factor into account. The standards affecting the value of residence property in an urban setting, subject to zoning controls and controlled planning techniques, cannot be the standards by which agricultural properties are judged.

People employed in a city who build their homes in suburban areas of the county beyond the limits of a city and zoning regulations do so for a reason. Some do so to avoid the high taxation rate imposed by cities, or to avoid special assessments for street, sewer and water projects. They usually build on improved or hard surface highways, which have been built either at state or county expense and thereby avoid special assessments for these improvements. It may be that they desire to get away from the congestion of traffic, smoke, noise, foul air and the many other annoyances of city life.

But with all these advantages in going beyond the area which is zoned and restricted to protect them in their homes, they must be prepared to take the disadvantages.

Since the injury to the neighborhood is slight when viewed in the light of occasional annoyance to any one individual, it is even more trivial when viewed in the light of the fact that this area is primarily agricultural in its nature. Anyone moving into the area is bound to accept the agricultural pursuits carried on in the area, or which under reasonable circumstances might be expected to be carried on in the area. Moreover, the history of the area in question indicates that it has been used for feeding livestock since 1924 with only occasional interruption. Due to the natural contours of the land and its proximity to a growing and expanding population it follows that injuries of which these appellees complain resulted from the development of the natural and historical resources of Kansas, to-wit: Cattle. When viewed in this light, the use to which appellants have put their land, under the conditions existing in this area as indicated by the trial court's findings, cannot be said as a matter of law, or as a matter of fact, to be an unreasonable use of their property subject to injunction and abatement.

In our opinion the trial court's conclusion that appellants' operation of the cattle feed lot is a nuisance subject to abatement, and the judgment rendered pursuant thereto, are not supported by the findings of fact. Where an action is tried to the court and the court is asked to make findings of fact and conclusions of law pursuant to G. S. 1949, 60-2921, it is essential that the findings made include all the facts necessary to support the judgment. (*Young v. Washington County Comm'rs,* 127 Kan. 227, 273 Pac. 398.)

It therefore follows that the judgment of the lower court is reversed with directions to vacate and set aside the permanent injunction and to enter judgment for the defendants.

FATZER, J., dissenting: In my judgment, this record discloses the feed lot in question is in fact a nuisance. Time does not permit a full summary of the evidence which I think supports the finding of the trial court that the odor and flies affect the use and enjoyment of the properties of the plaintiffs. The granting of an injunction rests largely in the discretion of the trial court, which, in this instance, not only heard the testimony and observed the witnesses, but also viewed the premises of the plaintiffs and the defendants. I would affirm the judgment of the trial court granting the injunction.