Thomas WARTENSLEBEN, Appellant
(Plaintiff below),

v.

Ralph WILLEY and William D. Redle, Appel-
lees (Defendants below).

No. 3455.

Supreme Court of Wyoming.

June 21, 1966.

Jack Wolfe, Sheridan, for appellant.

Brown, Healy, Drew, Apostolos & Bar-
ton, William H. Brown, Casper, Redle,
Yonkee & Redle, Sheridan, for appellees.

Before PARKER, C. J., and HARNS-
BERGER, GRAY, and McINTYRE, JJ.

Mr. Justice McINTYRE delivered the
opinion of the court.

The Plaintiff, Thomas Wartensleben,
brought a tort action against his neighbor,
Ralph Willey, and against Willey's attor-
ney, William D. Redle, for damages which
plaintiff claims to have suffered because
Willey and Redle caused Sheridan Flour-
ing Mills, Inc., not to complete a contract
with Wartensleben pertaining to the es-
tablishment of a feed lot for cattle on War-
tensleben's land.

The findings of the trial court included
a finding that actions of the defendants
were the cause of plaintiff's failure to se-
cure the contract with Sheridan Flouring
Mills, for construction and operation of the
feed lot previously staked and contemplat-
ed on Wartensleben's land.

We will not question or disturb this find-
ing. There is no denial that defendants
protested the establishment of the feed lot;
nor that they threatened by telephone calls
and letter to bring an action for injunction
on the ground of a nuisance, if the feed
lot was constructed and operated at the lo-
cation selected. The result was that Sheri-
dan Flouring Mills established its feed lot
elsewhere, and Wartensleben lost the bene-
fit of a contract he otherwise would have
had.

The question for us, on appeal, is this:
Under the circumstances of this case were
Willey and his attorney privileged to do
what they did; or did they unreasonably
interfere with the business transaction be-
tween plaintiff and a third party, Sheridan
Flouring Mills?

The findings of the trial court were against plaintiff-appellant on this issue. It found defendants did not use illegal means, make material misrepresentations, or resort to fraud or intimidation; and that defendants did not employ unreasonable obstructions or molestations in protecting what they believed, in good faith, to be the exercise of their legal rights. On the basis of such findings, judgment was entered for defendants. The plaintiff, Wartensleben, has appealed.

■ Appellant's starting premise—that the intentional interference with contractual relations, without justification, creates liability for the harm thereby caused—brings no material disagreement from us. See 4 Restatement, Torts, § 766, p. 49 (1939). But we still must concern ourselves with a determination as to whether defendants were reasonably justified in doing what they did to prevent the establishment of the feed lot on Wartensleben's land, adjacent to Willey.

On the subject of justification, it is set out in 4 Restatement, Torts, § 773, p. 87 (1939), that:

"One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction."

In an annotation on the subject of liability for procuring breach of contract in 26 A.L.R.2d 1227, 1234, it is indicated authority supports the rule that a party to a contract has a right of action against a person who has procured a breach of such contract by the other party thereto "otherwise than in the legitimate exercise of his own rights."

■ Let us consider, then, what caused Willey to object to the establishment of a feed lot for cattle on Wartensleben's land and see if there was substantial evidence to support the finding of the trial court that the actions of Willey and his attorney were in the legitimate exercise of Willey's rights and not illegal or unreasonable. There is very little, if any, conflict in the evidence. However, it is in any event proper for us, under appellate rules, to construe the evidence in the light most favorable to Willey.

The plaintiff, Wartensleben, and defendant Willey own adjoining ranches. The buildings on the Willey ranch, including the family residence, are located near the boundary fence and within 950 feet of the site which had been proposed for the feed lot. Willey had been informed by Wartensleben that 2,000 head of cattle would be fed at the lot.

Mead Creek flows through both places, first across the Wartensleben property and then on to and across Willey's property. Prevailing winds in the area are such that they blow from the proposed location toward Willey's residence. In other words, the proposed location for the feed yard was upstream and upwind from the Willey land and residence.

While plaintiff contends the waters from Mead Creek are not used directly by ranchers for domestic purposes, they are used for irrigation and the watering of livestock. Also, the water which the Willey family drinks comes from a well which is only 60 feet deep, and waters from Mead Creek are used to irrigate garden vegetables and produce. Willey claims heavy washing of mud and gravel from the Wartensleben lands in the vicinity of the feed yard location, onto the Willey lands, had been experienced in the past.

At the trial, expert testimony was offered tending to show the incidence of disease is higher among cattle kept in a confined area; that such disease can be communicated through drainage, dust or wind; that flies and rodents are increased; and that manure from cattle fed on typical feed-lot rations is particularly offensive. There was considerable testimony indicating Willey would have had a noise and odor

problem, if the feed lot had been established where it was proposed. Additionally, evidence was before the court tending to show the establishment of the feed lot at the proposed site would have detracted materially from the monetary value of the Willey ranch.

Thus, the trial court was justified, on the basis of the evidence before it, in finding that Willey was in fact and in good faith fearful that the feed lot would be detrimental and a source of annoyance to him and to his family, and that it would cause a lessening in the value of his own property.

Counsel for Wartensleben argues that a feed lot for cattle in a ranching area cannot be said to be a nuisance per se. We are inclined to agree. The district court found the lot would not have been a nuisance per se, but would have become a private nuisance in fact, or per accidens, by reason of the circumstances and surroundings. It did not pretend to hold that all lots for the feeding of livestock would constitute a nuisance, but rather that each case must be judged individually upon its own facts and circumstances.

■ The question before the trial court was whether Willey and his attorney honestly and in good faith believed the proposed feed-lot operations would have constituted a nuisance; or whether they had reasonable grounds to believe such operations—under the circumstances here present—could be enjoined as a nuisance. The trial court did not need to decide, and we do not decide, whether Willey and his attorney would or would not have been successful if the lot had been established and they had initiated an injunction action.

However, whether feed-lot operations such as were proposed in this instance (within 950 feet of a neighbor's dwelling) can be considered an enjoinable nuisance is sufficiently debatable to justify the trial court's finding of reasonableness and good faith on the part of defendants.

For verification of this statement see Dill v. Excel Packing Co., 183 Kan. 513, 331 P.2d 539, 546 and 549, where it was held a cattle feeding operation was not a nuisance per se and would not be enjoined "unless" the circumstances disclose it is in fact a nuisance. One of the reasons for not enjoining in that case was that the operation was in an area which had been used for cattle feeding purposes for a long time. Also there apparently was no applicable statute in that case, and yet the court's decision was a divided one.

Also, see Basham v. Eureka Locker & Cold Storage, 164 Kan. 119, 187 P.2d 500, 502, where a slaughterhouse was held not to be a nuisance per se, but a prima facie nuisance; McCollum v. Kolokotrones, 131 Mont. 438, 311 P.2d 780, 783, where it was said a chicken or poultry business is not a nuisance per se but may become a nuisance per accidens; and Kramer v. Sweet, 179 Or. 324, 169 P.2d 892, 895, where the court said neither a meat processing plant nor a slaughterhouse is a nuisance per se but may become a nuisance by reason of the character of the neighborhood in which it is situated.

As far as the instant case is concerned, Willey and his attorney had special reason to believe the Wyoming courts may have issued an injunction. There are at least two statutes in Wyoming defining nuisances, the application of which would be debatable when applied to circumstances which would have been present in the event Sheridan Flouring Mills had established the proposed feed yard on Wartensleben's land. Those statutes are §§ 35–462 and 35–479, W.S.1957.

Lifting out of § 35–462 only those portions which would be applicable to a consideration of whether the proposed feeding operations might have been a nuisance, we have this:

"The depositing, placing, or causing to be placed or put, * * * refuse matter

from any * * * hog pen, stable * * * or any offensive matter or substance whatever upon or into any * * * lot, field, meadow, * * * or in any other and different locality * * * in this state so located that the said substance shall directly or indirectly cause or threaten to cause the pollution or impairment of the purity and usefulness of the waters of any * * * stream, irrigation ditch * * * or water supply whether surface or subterranean, which are used wholly or partly as a source of public or domestic water supply, or where the same may become a source of annoyance to any person, or within one-half mile of any inhabited dwelling, * * * by any person or persons, association of persons, company or corporation, * * * or the knowingly permitting of such acts by the owner, tenant, or occupant of said places, upon, into, or on said places, or the permitting of said offensive substances or other offensive substances to remain thereon or therein, shall be unlawful and is hereby declared to constitute a nuisance detrimental to the public health and general welfare of the citizens of Wyoming * * *."

Also, lifting out of § 35–479 only those portions which would be applicable to a similar consideration, we have the following:

"If any person, company or corporation * * * shall erect or establish any offensive trade, * * * or continue the same after it has been erected or established, or shall in any wise pollute * * * any water course, * * * so as to render the same unwholesome or offensive to the * * * neighborhood thereabouts; every person, company or corporation so offending, shall upon conviction thereof, be fined not exceeding one hundred dollars; and every such nuisance may, by order of the district court before whom the conviction may take place, be removed and abated by the sheriff of the proper county."

In Hillmer v. McConnell Brothers, Wyo., 414 P.2d 972 (June 2, 1966), we said the police power of the state extends to the prevention and abatement of nuisances; and a legislative body, within constitutional limits, may prescribe what shall constitute a nuisance.

It should be clear, in the light of what we have said, that there was ample in the evidence to justify the trial court's findings, and judgment should therefore be affirmed.

Affirmed.