No. 47,077

BROOKOVER FEED YARDS, INC., *Appellee*, v. DARRELL D. CARLTON, Commissioner of Labor of the State of Kansas, *Appellant*.

(518 P. 2d 470)

Opinion filed January 26, 1974.

*F. Duane Roberts*, of Topeka, argued the cause and was on the briefs for the appellant.

*Stanley G. Andeel*, of Foulston, Siefkin, Powers and Eberhardt, of Wichita, argued the cause, and *Ray H. Calihan, Jr.*, of Calihan, Green, Calihan and High, of Garden City, was with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is a proceeding to determine an employer's liability for contributions under the employment security law (K. S. A. 44-701, *et seq.*). The issue is whether the employees of a commercial feedlot are excluded from its coverage under the agricultural labor exemption clause.

Classification proceedings initiated by the state labor commissioner, Darrell D. Carlton, to make Brookover Feed Yards, Inc. liable for contributions for coverage of its employees under the act culminated in the commissioner's decision dated September 11, 1969, holding Brookover liable for such contributions commencing with the year 1963.

The facts developed in proceedings held September 5, 1968, before the hearings' officer for the commissioner, may be summarized in the following. Brookover conducts a business of custom feeding of cattle for others. It began operations in 1951. Since 1957 it has

operated as a corporate entity. Its office and plant facilities are on approximately 200 acres of land located about one mile north of Garden City. Its plant facilities include large scale mill and feed mixing structures, storage tanks and silos, grain drying equipment, drainage ponds, maintenance buildings, scales for weighing grain and cattle and many cattle pens. Specially designed trucks are used to convey feed from the mixing and storage plants and auger it into concrete feed bunkers for daily consumption by the cattle.

Additionally, Brookover controls 800 acres of cropland upon which feed grains are raised to be fed to cattle in the feedlot. Brookover is federally licensed for buying and storing grain and purchases most of the feed utilized in its operation from other sources. Feeding capacity in 1968 was 27,000 head of cattle with about 88% of that capacity utilized. None of the cattle belong to Brookover; however, about 25 to 35% of them usually belong to corporate "insiders". Customers include farmers, livestock growers and packing companies. Cattle are held, fed and cared for in the feeding operation for an average period of 130 days with an average daily weight increase of two and one-half pounds per head. The corporation furnishes that which is described as all final finishing services to produce the highest quality cattle. It also loads them for shipment to market. As remuneration it receives a fixed handling or service fee per head per day plus the cost of feed consumed.

Brookover employs forty-four persons in this enterprise. Three of these are engaged in conventional crop-raising activities on the 800 acres. The others perform services at Brookover's office, mills, storage facilities, maintenance shops and feedlot on the 200 acre tract. Three of these are clerical workers whose work consists of placing orders for feeds and materials, receipting orders for cattle, preparing payrolls, reports and operating statements and generally keeping corporation records. The jobs of the others are described as cowboys, cat operator, tank cleaners, maintenance and shop workers, truck drivers, mill helpers, bunk checkers, welders and various types of foremen. Much of the record before the commissioner was devoted to depicting the "big business" aspect and the technical nature of the operation by Brookover, a corporation whose reported assets were in excess of $1,400,000 in 1967.

In his memorandum opinion the commissioner reviewed the history of custom feedlots in Kansas and made certain findings.

He found Brookover's operation constituted a commercial business venture rather than an ordinary farming operation as contemplated by or known to the legislature when it enacted the employment security law. He further found that the 200 acre tract on which the principal operation was located was not a farm or ranch as contemplated by Kansas Administrative Regulation 50-1-3 then in effect. In ruling that Brookover's employees were covered by the act the commissioner exempted the three who raised crops on Brookover's other land.

Upon judicial review instituted by Brookover the commissioner's order holding it liable for contributions for coverage of the forty-one employees during the period in question was reversed. The trial court's rationale was that by definition of the term "agricultural labor" in regulation 50-1-3 the commissioner had attempted to extend the coverage afforded by the employment security law beyond that prescribed by the legislature, that the ordinary meaning of the term "agricultural labor" embraces the raising of livestock, and federal agencies construing virtually identical federal acts have so concluded, and further that the term "agricultural labor" includes the work of those employed in commercial feedlots.

The commissioner has appealed to this court. By way of cross-appeal Brookover contends the trial court erred in denying its motion to dismiss that appeal for want of timely filing by the commissioner of his notice of appeal. The cross-appeal has no merit. The trial judge determined the effective date of his judgment. Appellant's notice of appeal was filed within sixty days from that date; hence, it was timely filed (K. S. A. 60-258; 60-2103 [a]).

Appellant presents numerous points of error but essentially the question is whether the labor performed by appellee's employees is "agricultural labor" within the meaning of our employment security law.

The pertinent statute, K. S. A. 44-703, after establishing tax liability of employers for various types of "employment" covered by the act, provided:

". . . (i) . . . The term 'employment' shall not include: . . . (4) agricultural labor. . . ."

Our employment security law was enacted in 1937 and the foregoing remained unchanged, without further statutory definition, during the period in question, although it was subsequently

amended as will be mentioned in connection with appellant's contentions.

Appellant first asserts that judicial review is limited to determining whether the facts found are supported by the evidence before the administrative agency, and inasmuch as the trial court found there was no material dispute as to the facts, it erred in not upholding the administrative decision. Not so. K. S. A. 44-710b. (*b*), which authorizes review by a district court of the commissioner's order determining liability for contributions under the act, provides:

"In any proceeding under this subsection the findings of the commission as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive and the jurisdiction of said court shall be confined to questions of law."

This statute simply prescribes the ordinary scope of judicial review of administrative action (*Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, Syl. ¶ 1, 436 P. 2d 828, 28 ALR 3d 472). Construction of a statute and its application to a given situation are matters of law for judicial determination. The trial court was not bound to reach the same conclusions of law as did the administrative agency even though the evidentiary facts were undisputed (*Read v. Warkentin, Commissioner*, 185 Kan. 286, 291, 341 P. 2d 980). It properly treated the issue before it as one of law.

The initial legislation on the subject of unemployment compensation insurance was the 1935 enactment of federal social security acts, as a consequence of which our employment security law was enacted in 1937. In both, "agricultural labor" was exempted from the benefits thereof, apparently because of the difficulty of administering the act in that type of enterprise; however, the term was not statutorily defined. The federal acts left this task to the commissioner of internal revenue, who in turn promulgated Regulations 90 which defined "agricultural labor" as including all service performed:

"(*a*) By an employee, on a farm, in connection with the cultivation of the soil, the harvesting of crops, or the raising, feeding, or management of livestock, bees, and poultry; or

"(*b*) By an employee in connection with the processing of articles from materials which were produced on a farm; also the packing, packaging, transportation, or marketing of those materials or articles. Such services do not constitute 'agricultural labor,' however, unless they are performed by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced, and unless such processing, packing, packaging, transportation, or marketing is carried on as an incident to ordinary

farming operations as distinguished from manufacturing or commercial operations.

"As used herein the term 'farm' embraces the farm in the ordinarily accepted sense, and includes stock, dairy, poultry, fruit, and truck farms, plantations, ranches, ranges, and orchards."

Later, in 1939, Congress amended its legislation to accord with the IRS definition of agricultural labor. In 1951 the Kansas commissioner of labor for the first time promulgated a regulation defining the term which, as it was in effect in 1966, provided:

"(b) *Agricultural labor.* The term 'agricultural labor' includes all the services performed:

"(1) On a farm by an employee of the owner or tenant of the farm in connection with the cultivation of the soil and harvesting of crops or the raising and feeding of livestock, bees and poultry, or in connection with the preparation, packing, packaging, or transporting to market of these materials or articles when carried on as an incident to ordinary farming operations.

. . . . . . . . . . . .

"(3) *Farm.* The term 'farm' as used in this and foregoing paragraphs of this section, includes stock, dairy, poultry, fruit, fur-bearing animals, and truck farms, ranches, nurseries, ranges, orchards, and such greenhouses and other similar structures used primarily for the raising of agricultural or horticultural commodities." (KAR 50-1-3.)

Appellant is authorized to make regulations in administering the employment security law and it is by reason of his interpretation of the foregoing regulation he has determined that appellee's forty-one employees were not engaged in agricultural labor. It may be noted, however, that appellant has made a distinction in determining liability for unemployment security contributions where the feedlot owner also owns the cattle being fed—in this instance the operation is considered an incident to ordinary farming operations and no liability is assessed, while on the other hand the feedlot owner who does not also own the cattle is considered as having merely provided a service to the livestock owners on a commercial basis and liability for contributions is assessed. Appellant's reasoning is that to constitute "agricultural labor" the services must be such as to be "incident to ordinary farming operations" as prescribed in the 1951 regulation, that a custom feedlot is not such an operation and was not contemplated or even known to the legislature in 1937 when it enacted the agricultural labor exemption clause.

Appellant also points to action by the 1971 legislature in its amendment of the employment security law, K. S. A. 1971 Supp. 44-703, as follows:

"(*w*) 'Agricultural labor' means any service performed prior to January 1, 1972, which was agricultural labor as defined in regulation No. 50-1-3 (*b*), and any remunerated service performed after December 31, 1971, as defined in the paragraphs of this subsection:

"(1) On a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife. . . ."

We have no legislative history to aid us in construing this amendment. Appellant's argument is that the legislature retroactively adopted the 1951 regulation defining agricultural labor with the result that reversal of the trial court's judgment must follow.

Appellee responds—not necessarily so. It contends that neither application of the new statute defining "agricultural labor" (now K. S. A. 1973 Supp. 44-703 [*w*]) nor correct interpretation of the 1951 regulation (since revised to conform to the 1971 legislative amendment) calls for reversal of the trial court's order. Appellee says both define agricultural labor as services performed in the "raising" and "feeding" of livestock; that the phrase in the 1951 regulation "when carried on as an incident to ordinary farming operations", relied upon by appellant for his conclusion, modifies only the disjunctive phrase dealing with services performed "in connection with the preparation, packing, packaging, etc." of certain articles. Appellee's contention may be more easily understood by requoting the 1951 regulation, but adding thereto the letters (A) and (B) for the purpose of proper construction of the entire paragraph, thus,

"(*b*) *Agricultural labor.* The term 'agricultural labor' includes all the services performed:

"(1) On a farm by an employee of the owner or tenant of the farm (A) in connection with the cultivation of the soil and harvesting of crops or the raising and feeding of livestock, bees and poultry, or (B) in connection with the preparation, packing, packaging, or transporting to market of these materials or articles when carried on as an incident to ordinary farming operations."

Appellee also cites in support of the trial court's ruling our own case law defining the term "agriculture" or similar phraseology where feedlots have been involved, as well as federal agency decisions respecting commercial feedlots. As to the latter, appellant asserts, and correctly so, that in construing state statutes this court is not bound by federal interpretations (*Read v. Warkentin, Commissioner,* supra). Nonetheless, this does not mean

this court will perfunctorily ignore federal determinations nor refuse to hold in the same manner where deemed appropriate. Indeed, this court has on many occasions declared that great weight will be given the decisions of foreign tribunals, including federal, in considering construction of identical, or substantially so, legislation after which our own has been patterned (see *e. g., State v. Richardson,* 194 Kan. 471, 472, 399 P. 2d 799; *Small v. Small,* 195 Kan. 531, 538, 407 P. 2d 491; *Marr v. Geiger Ready-Mix Co.,* 209 Kan. 40, 495 P. 2d 1399).

The first of the federal agency decisions cited is Revenue Ruling 60-115, C. B. 1960-1, p. 396. There a feedlot operation was described as one similar to appellees but it was not stated whether the operator owned the cattle being fed. The ruling concluded the feedlot in question constituted a "farm" and the feeding operation met the "raising" requirement of the federal statute, saying:

"In order to constitute a 'farm,' it is necessary to 'raise' a commodity. In cases involving the feeding of livestock, it is necessary to ascertain the primary purpose of the feeding operation. As a general rule, if livestock is held, fed and cared for over a period of time necessary to make a substantial weight increase, the area where the livestock is held should be regarded as being a 'farm' in determining whether or not services performed thereon constitute 'agricultural labor' for Federal Insurance Contributions Act purposes. . . .

"In the instant case, during the course of the feeding operation conducted by the company, the livestock is held, fed and cared for in the feeding establishment for a period of 120 days, during which time the average daily weight increase is two and one-half pounds per head. Under these circumstances, the Service considers the 'raising' (of an agricultural commodity) requirement of section 3121 (g) as having been satisfied to the extent necessary to qualify the feeding establishment as a 'farm.' Accordingly, it is held that the company's feeding establishment constitutes a 'farm' within the meaning of section 3121 (g) of the Federal Insurance Contributions Act. It is further held that the services described above as being performed by the company's employees, including clerical, supervisory and administrative services, constitute 'agricultural labor' within the meaning of that section." (p. 397.)

The mentioned federal statute, section 3121 (g) Internal Revenue Code of 1954, is essentially similar to 1951 KAR 50-1-3 (b) and verbatim to the 1971 amendment of K. S. A. 44-703 (w).

The next federal ruling cited is the result of appellee's January, 1968, application to the internal revenue service for a private letter ruling relating specifically to its feedlot operation and requesting elaboration of the conclusion reached in Revenue Ruling 60-115. On February 28, 1968, the service responded. That private letter ruling was received as an exhibit in the hearing before appellant

and has been reproduced in the record on appeal before us. It is prefaced with a detailed factual outline of appellee's feedlot activity. The ruling was that appellee was exempt from the federal insurance contributions act and the federal unemployment tax act because of the agricultural labor provisions and for the same reason was not required to withhold federal income tax from the remuneration paid its employees.

With regard to the commercial aspect the ruling stated:

"It seems that the reason for this request has arisen from a question being raised whether the holding in Rev. Rul. 60-115 was predicated upon whether the feed lot operator was the 'owner' of the livestock.

"We may state unequivocally that the holding in Rev. Rul. 60-115 did not consider the identity of the owner of the livestock. . . . [O]ur holding looks for the existence of a 'farm', that is, as stated in the Ruling, an area where an agricultural commodity, livestock, is held, fed and cared for over a period of time sufficient to constitute a 'raising' operation, as distinguished from a mere 'holding' for immediate sale. In the Ruling we did not consider the identity of the owner of the livestock. Under paragraphs (1) and (2), section 3121 (g), it is necessary only to determine whether the establishment where the services are performed is a 'farm'.

"Upon the basis of the information furnished we conclude that for Federal employment tax purposes the feed lot operated by Brookover Feed Yards, Inc., constitutes a 'farm'. Accordingly, all of the above-stated services performed by the corporation's employees in connection with its cattle feeding operation are 'agricultural labor,' as that term is defined in section 3121 (g) and 3306 (k) of the Federal Insurance Contributions Act and the Federal Unemployment Tax Act, respectively."

The services of appellee's three office workers were included within the ruling made.

A third federal holding comes in an opinion letter of the federal wage-hour administrator concerned with determining whether commercial feedlot employees were exempt from the application of the federal fair labor standards act by reason of being agricultural laborers (Wage-Hour Administrator Opinion Letter No. 667, September 21, 1967; CCH Labor Law Reports, ¶ 30,660, 1967). The administrator concluded:

"The care and feeding of livestock at feedlots for periods of 80 to 120 days is considered the raising of livestock and is therefore 'agriculture', as that term is defined in section 3 (f) of the Act. The exemption in section 13 (a) (6) or 13 (b) (12), whichever is appropriate, would be applicable to these activities whether the employer has raised the animals, purchased them for feeding purposes, or is raising them for other parties for a charge."

The United States Tax Court was recently concerned with

whether a Kansas corporation operating a commercial feedlot at Leoti, Kansas, in a manner virtually identical to that in the case at bar, was conducting a farming operation within the meaning of federal income tax regulations permitting the filing of returns on a cash basis of accounting. The years involved were 1966, 1967 and 1968. The court held that the operation constituted a farm for such purpose *(Hi-Plains Enterprises, Inc. v. Commissioner of Internal Revenue,* 60 T. C. No. 19, ¶ 60.19 Prentice-Hall TC [1973]). (For other cases dealing with particular aspects of "farm" labor under federal and state unemployment compensation laws see anno. 53 ALR 2d 406).

Our own case law points in the same direction as the cited federal rulings. In *Dill v. Excel Packing Co.,* 183 Kan. 513, 331 P. 2d 539, plaintiff sought to enjoin the operation of a cattle feedlot on the ground it constituted a nuisance to the particular area involved. In holding for the defendant this court stated that the operation constituted an "agricultural pursuit", thereby exempting it from some nuisance requisites.

*Fields v. Anderson Cattle Co.,* 193 Kan. 558, 396 P. 2d 276, another nuisance case dealing with a commercial feedlot, involved the application of a county zoning exemption for land used for agricultural purposes. The operation was held to constitute an agricultural enterprise. This court stated:

"In its commonly accepted sense the term 'agriculture' includes the breeding, rearing and feeding of livestock in preparation for market. The preparation of farm products for market is the dominating purpose of the agriculturalist.

"Whether the owner of livestock fattens his cattle for market in the blue stem pastures of the Flint Hills or in feed lots where they are given more condensed rations, the preparation for market continues as an agricultural pursuit." (pp. 563-564.)

Finally, appellee cites a portion of our law regulating feedlots, enacted in 1963, as follows:

"47-1502. *Feeding livestock as agricultural pursuit; zoning.* Feeding of livestock, and animal husbandry, for the purpose of this act shall be considered to be, and shall be construed to be, an agricultural pursuit: *Provided,* Such agricultural pursuit may be subject to any city zoning provisions created under the laws of Kansas or any subdivision thereof."

The foregoing authority cited by appellee leads us to conclude that appellee's employees were engaged in "agricultural labor" within the meaning of the statutory exemption in question as held by the trial court. The important factor in determining their status,

of course, was the nature of the work they performed. Cattle were being fed and cared for at the situs of appellee's activity. That was the crux of the entire operation. They were there for an average period of 130 days during which their weight substantially increased—an average of two and one-half pounds per day per head. This was not a temporary holding operation between their "raising" or "feeding" and their sale to the packer, rather it would appear to have been an integral part of such raising and feeding. The "raising and feeding" requisite of KAR 50-1-3 was thereby satisfied. The services of the forty-one employees in question were performed within the confines of the feeding establishment. Those premises fall within the definition of a farm under the 1951 regulation.

.In reaching his determination appellant placed great emphasis upon his interpretation of the 1951 amendment that "the raising and feeding of livestock" must have been "carried on as an incident to ordinary farming operations". The fallacy here is as pointed out by appellee. The latter phrase was intended to refer only to the work of preparing, processing, packaging or tranporting certain farm commodities. It was not required that cattle be raised and fed as an incident to farming operations carried on as in 1937 in order for the exemption to apply. Appellant further stressed the fact appellee did not own the cattle being cared for in the feedlot— if it had owned them the record reveals the labor would have been considered "agricultural labor" despite the fact the employees' work remained the same in both instances.

Appellee's clerical employees likewise worked on the feedlot premises. The present day burden of clerical work cast upon large-scale farming operations is well known. The status of persons so engaged was discussed in *In re Lamp*, 57 Wn. 2d 629, 358 P. 2d 966, an unemployment compensation case, as follows:

"We desire to make it clear that we have no quarrel with the position that the handling of payrolls, bookkeeping, and record keeping can be agricultural labor, *i. e.*, they are incident and corollary to the cultivation of land and to the growing, harvesting, and transportation of crops. *In re Butler* (1940), 258 App. Div. 1017, 16 N. Y. S. (2d) 965. Indeed, it becomes increasingly apparent that almost every farmer needs an accountant and, perhaps, a lawyer at his elbow. In the *Butler* case it is said:

"'. . . Farming, when conducted in a business-like manner, does not lose its identity. An employee who keeps records concerning the production of farm produce and its sale is engaged in tilling the soil as well as the employee who stirs the surface of the earth with a hoe. The acts are interrelated and on a farm of the size owned by this employer, conducted as he conducted the

business, the scrivener and accountant are as necessary as the cultivator.' " (pp. 631-632.)

Our employment security law mentions several types of service which are specifically covered but service performed by a clerical worker upon a farm is not one of them.

We think the services of appellee's clerical employees must be deemed to have been rendered "in connection with . . . the raising and feeding of livestock", as broadly stated in the 1951 regulation.

Our holding is that the services performed by the employees of a corporate feedlot operator doing custom feeding and finishing of cattle constitute "agricultural labor" within the meaning of the exemption clause of the Kansas employment security law.

The district court reached the correct result. We have not over-looked a specification of error by appellant deriving from an *ex parte* communication to the trial judge pending his determination of the case, made by a lawyer who was not counsel for either litigant but who was attorney for another feedlot operator. The issue before the trial judge was purely one of law and prejudice could not have resulted from the action complained of.

The judgment is affirmed.

APPROVED BY THE COURT.

FROMME, J., not participating.