### GOLDEN HILLS TURF AND COUNTRY CLUB, Inc., et al. v. BUCHANAN.

No. 67-310.

Circuit Court, Marion County.

October 27, 1970.

Ayres, Swigert, Cluster & Tucker, Ocala, for plaintiffs.

John Marshall Green, Ocala, for defendant.

W. TROY HALL, Jr., Circuit Judge.

*Final judgment:* On May 8, 1967, the plaintiffs filed their complaint asking for a temporary and permanent injunction against the defendant in which they alleged that the defendant was operating a cattle feed lot on lands owned by him and that the defendant's operation was creating a nuisance in that it emitted a stench which was foul, penetrating, fecal-smelling and which permeated the area in which the plaintiffs had their homes, club facilities, businesses and school. The plaintiffs alleged that the defendant was concentrating on a small concrete area, large numbers of cattle and

that the excrement by these animals was the source of the odors which they described and which they alleged created a nuisance. They sought injunctive relief to restrain the defendant from further conducting his cattle operation in a manner which would cause these odors that constitute a nuisance to the plaintiffs and which reduce and irreparably damage the value of the various properties which were enumerated in the complaint.

The defendant, on the other hand, answered the complaint and alleged that he was conducting his cattle operation in accordance with the laws of the state of Florida, that his operation was a modern, superbly equipped facility, that it emitted no more than ordinary barnyard smells and did not constitute a nuisance.

Various discovery procedures were instituted, some additional pleadings were filed, some stipulations of facts were entered into by the parties prior to the actual initiation of testimony at the trial. The trial commenced on February 18, 1969, and the court conducted a four day hearing at which some 643 pages of testimony were heard. In addition to this, the court with the consent of all of the parties visited the premises of both the plaintiffs and defendant. The cause was ably presented by counsel for both parties and the court is indebted to them for their efforts.

The evidence and the court's examination of the premises revealed that the defendant, H. S. Buchanan, is a cattleman in Marion County who owns some 720 acres of land which is located approximately ten miles northwest of the city of Ocala in what is generally considered as an agricultural area of the county. As part of his cattle operation in 1951, he began what is commonly known as a "feed lot" facility. The beginning, as in most enterprises, was modest with approximately 100 cattle on a sand lot. In 1962 he increased the size of the feed lot and the number of cattle so that he was accommodating some 1.500 to 1,800 cattle at that time. In 1966, the defendant was utilizing a 20 acres sand lot on which he kept some 2,500 to 2,700 cattle. The theory behind the "feed lot" operation is to keep cattle confined in a small area which restricts their movement and at the same time feed them large quantities of concentrated feed so that the weight gain is greatly accelerated in a relatively short period of time before they are marketed. Calculations and estimations by various experts concerning the type and quantity of feed, the type of facility and other matters are made available to the cattleman to aid him in accomplishing his objective.

In the year 1960, the plaintiff, Castro Realty Corporation, in which the principal figures are Bernard Castro and his wife, Theresa Castro, purchased approximately 3,300 acres adjoining the property of the defendant and lying south and east thereof on both

sides of U.S. Highway No. 27; and in the year 1963, the plaintiff, Castro Realty Corporation, conveyed 500 acres of its property to a corporate entity known as Golden Hills Turf and Country Club, Inc., which 500 acres of land lie immediately south and west of the land of the defendant. Over the period from 1963 to 1966, this 500 acre tract was improved by the plaintiff, Golden Hills Turf and Country Club, Inc., with a golf club and an 18 hole golf course and was subdivided into a residential subdivision with paved streets and water, and several fine homes were constructed in the subdivision prior to the fall of the year 1966, together with a clubhouse, at an aggregate development cost in excess of a million dollars. In addition, Mr. and Mrs. Bernard Castro organized and constructed on other land of the Castros lying south of U.S. Highway No. 27 a private elementary and secondary school known as Golden Hills Academy with facilities for approximately 100 students at a cost of more than $250,000 during the years 1964 and 1965 and built a private residence on their land just south of U.S. Highway No. 27 and immediately south of Golden Hills Turf and Country Club, Inc., at a cost of more than $100,000. By the fall of the year 1966, Golden Hills Turf and Country Club had more than 300 golfing and social members which included the owners and occupants of the several residences which had been constructed in the subdivision. During the period from 1964 to the present, the Castros have carried on a cattle operation on their remaining lands surrounding the Golden Hills Turf and Country Club and subdivision on which they pasture approximately 500 cattle, and they also maintain a riding stable for the students at Golden Hills Academy with some 35 riding horses in stables and pastures adjacent to the school.

From all of the witnesses on both sides, it was agreed that no problems of coexistence arose between the defendant and Golden Hills Turf and Country Club, the individual home owners, the Castros or Castro Realty Corporation until the year 1966.

Late in the year 1966, the defendant constructed on a five acre plot, near the old 20 acre feed lot site, a new "feed lot facility". This facility cost the defendant approximately $250,000 to build and consisted of a rectangular concrete area 1,000 feet long and 200 feet wide. A long feed trough ran down the center of this area and above the trough was an automatic feed loader which ran along on a monorail device dumping feed at periodic intervals into the trough. The concrete sloped two percent descending from the trough to the outer edge where gutters six inches to one foot deep and four feet wide were located. The total area was divided into 20 pens, 100 feet wide and 100 feet long. Adjacent to the actual concrete area were ten underground tanks with a capacity of 5,000

gallons each. These tanks were spaced so that each served two of the pens. Also, adjacent to the concrete area the defendant built a barn, storage and office facilities.

Upon this concrete surface and within these pens, the defendant originally placed approximately 4,000 head of cattle but by the time of trial and for some time prior to it, he had reduced the number of cattle to 2,500 although this would vary from time to time by as much as 500.

There was little disagreement about the method used by the defendant to conduct his operation at the time the trial occurred. He placed approximately 125 cows in each one of the 100 by 100 pens. The feed would be mixed in the barn area, loaded into the feeder which would automatically run down the feed troughs dumping the feed into the troughs. The cattle in each of the pens would then line up at the feed troughs and eat the feed which was a highly concentrated type of feed designed to fatten them for market. The restricted area in which the cattle moved did not allow them sufficient freedom to run any of the weight off and therefore he was able to produce certain amounts of weight on the cows before they were sent to market. This is the objective of the defendant's business and this is the thing for which he is paid by the owners of the cattle.

In order to clean the pens of the excrement issued by the cattle while they were being fattened for market, the defendant instituted a rotating method of cleaning them. Equipped with a high pressure water hose, a tractor with an attached blade and two men with hand tools, the defendant sought to mix the manure lying on the concrete with water until it attained a liquid consistency which would allow it to flow off the concrete into the gutters and ultimately to the tanks. At this point, the defendant pumped the liquid out of the tanks, into tank wagons which were pulled by tractors. These tank wagons, commonly called "honey wagons", would then be pulled over the remaining portion of the 720 acres spreading the liquid manure. One variation of this procedure occurred in hot dry weather. During these periods, the defendant utilized a tractor with a "front end loader". This device would scrape the dried manure from the concrete surface, dump it into a manure spreader which then spread it over the remaining portion of the 720 acre farm.

Regardless of the procedure used by the defendant, the average time it took to clean the pens ranged from seven to ten days depending upon weather conditions and other variables.

As was stated above, when the defendant first commenced his operation in the year 1966 he had approximately 4,000 cattle

confined in the area in which, at the time of the trial, he had 2,500. The defendant admitted that at the time he had 4,000 cattle confined in this area he was giving them feed mixed with oyster shells and at other times feed that had a high concentration of lactic acid in it. The defendant stated that he believed that these two factors combined to cause an unusually large amount of excrement from the cattle and a resulting odor which was pungent and extremely disagreeable. The defendant stated that after he had experimented with this feed and this number of cattle for a few months he discontinued the use of the particular type of feed, the oyster shells, and reduced the number of cattle from 4,000 up to and including about 2,500. He stated, and it was not contradicted, that he has had about this same number of cattle and has been feeding about the same type of feed since the time he discontinued his first methods of operation.

After the initial stench had abated, the testimony was conflicting as to whether or not the feed lot continued to emanate odors which were disagreeable, pungent and had a fecal stench. Although it was admitted by the defendant that the feed lot facility generated the usual barnyard smells, he denied that there was any stench from the place after he cut down the number of cattle from 4,000 to 2,500 and altered the diet of the cattle. The defendant presented the testimony of his wife, Mr. Augustus Kinsler, Mr. Hollis G. Ward, Mr. Ernest Jackson, Mr. Emanuel Kinsler, Mr. Horace Fulford and Mrs. Horace Fulford, who all testified that there was a barnyard smell to the feed lot but that since the original onslaught of stench which accompanied the opening of the operation they had not been able to detect the strong fecal stench. Some of these witnesses admitted that at times they could smell the feed lot but stated that it did not bother them. These witnesses lived varying distances from the feed lot, some as close as one mile and others as far away as two and three miles. Mr. Kinsler, Mr. Ward and Mr. Jackson were all entirely disinterested witnesses who were farmers around the area and the other witnesses either were associated with the defendant or had been associated with him in the feed lot enterprise.

The defendant produced one expert witness, Dr. James F. Henches, who was a professor of animal nutrition in the college of agriculture at the University of Florida in Gainesville. Dr. Henches testified that shortly after Mr. Buchanan opened the feed lot he had been out to inspect it. He noticed at that time a rather strong and disagreeable odor which he attributed to the fact that Mr. Buchanan was feeding the concentrated diet of feed along with oyster shells. Dr. Henches testified that he made frequent trips to the property subsequent to his first visit and that on these

later visits he was unable to detect any sort of unusual odor other than a normal barnyard smell. Dr. Henches testified that he was primarily concerned with animal nutrients and the diet of animals. He further stated that he visited many feed lots throughout the United States and that the one operated by Mr. Buchanan was a model for the southeastern United States.

Also called by the defendant was Gene Price, who was the Marion County Health Inspector, and he testified that he was the Environmental Health Director for the Marion County Health Department. Mr. Price, who was not exactly qualified as an expert, testified that he had been out to the feed lot operation on at least four occasions when complaints were made to him about the smell and that he had observed fewer flies than he had expected to, did detect some odor at times but nothing as bad as the first time he went. He testified that he thought Mr. Buchanan was making an honest effort to keep the manure off the concrete slab. Mr. Price stated that his inspections were confined to the barn area and about halfway down each side of the 1,000 foot long concrete slab on the outside. He testified that he had never gone to the end of the facility nor out in back of the facility.

On the other hand, the plaintiffs produced numerous witnesses who lived and worked in and around Golden Hills. Some of these were people who were attempting to develop the real estate in the area, such as Mr. Fusca, others such as Mr. and Mrs. Bernard Castro who lived and worked in the general area, various residents of the subdivision testified along with Mr. Clarence M. Camp, a club member, and Mr. George Mangan, president of the country club corporation.

In order to summarize the testimony of these witnesses, it might generally be said that early in the year 1967, the residents who lived in the subdivision around the golf course, the members of the country club, personnel at the Golden Hills private school and Mr. and Mrs. Castro began to complain that an extraordinarily strong fecal stench was present around the area where they lived and worked. All of the witnesses testified that the odor, at this time, was so strong as to be nauseous. These witnesses appeared to the court to be people of ordinary sensibilities, several of them had rural backgrounds and did not consider ordinary barnyard smells offensive. However, they testified that this smell was a powerful and shocking odor the likes of which they had not previously experienced. It was agreed that some time in late 1967 or early 1968, on through until the trial, the intensity and frequency with which the odor occurred abated somewhat. However, these witnesses testified that they continued to experience the same type of odor

which they all considered to be penetrating, strong and extremely disagreable and which they definitely characterized as fecal.

The plaintiffs also presented testimony which showed that real estate sales in the residential subdivision were inhibited because of the smell. The testimony tended to show that no one could predict when the smell would occur but that it frequently enveloped the area when the wind was from the direction of the feed lot and that it did occur when prospective residents were in the area. It was further pointed out that practically no interest could be generated after the prospective resident had experienced the smell.

The residents of the subdivision stated that when the wind was from the feed lot, they found out-of-door activities extremely unpleasant. They also testified that entertaining guests during these periods was embarrassing if not impossible. One witness testified that as a guest left his home and detected the odor he began to scrape his feet and examine his shoes apparently believing that he had stepped in fecal matter. This is only one example of the testimony generally given by residents of the subdivision. They also complained that a large number of flies periodically infested the area and were such a nuisance that because of these insects alone, outdoor cooking and entertaining was a disagreeable enterprise at best.

Members of the Golden Hills Country Club testified that the smell which periodically wafted over outside activities at the club, including golf, made use of the facilities unpleasant on numerous occasions. The club is the gathering place for many of the business and social activities associated with the large thoroughbred breeding industry around Ocala. There was testimony that on more than one of these occasions a strong fecal smell permeated the area and that swarms of flies caused embarrassment to the club and rendered the use of the facilities unpleasant and disagreeable.

The plaintiffs' witnesses testified that the smell and the flies varied from time to time but that the condition had not been remedied and had remained substantially the same for many, many months.

The plaintiffs produced expert testimony to the effect that each cow of the size confined at the feed lot would produce approximately 64 pounds of wet manure each day. Thus, if as the defendant testified, there were 2,500 cattle on the concrete area previously described, there would be deposited by the cattle some 160,000 pounds of manure each day. In each pen, 100 X 100, there would be deposited during the seven days before it was cleaned, some 56,000 pounds of manure. The plaintiffs' experts

testified that the waste created by these cattle would equal that produced by approximately 40,000 people. Richard H. Jones, Ph.D., and a professional engineer specializing is waste disposal, testified that the present system utilized by the defendant to dispose of the waste was completely inadequate to do so without the emission of odor. Both Dr. Jones and David Knuth, Ph.D. and a microbiologist, testified for the plaintiffs and said that at the present time a large quantity of the waste deposited by the cows decomposed anaerobically. It was explained that when waste such as this begins to decompose under conditions where oxygen is not present, various foul smelling chemicals are emitted during the process. This type of decomposition is called anaerobic decomposition. Both experts agreed that this process continuously occurred at the defendant's feed lot. Dr. Knuth testified that the amount of manure which was decomposing in this manner would be considered "large" by any standards. These experts testified that as these foul smelling chemicals are emitted by the manure in its anaerobic decomposition on the concrete floor, they rise in the form of gases and can be transmitted by the wind for distances more than sufficient to reach the plaintiffs' facilities and homes.

Also, the defendant testified that at times of excessive rains, his tanks overflowed and the overflow went back into the pond or low area to the south of the feed lot. Dr. Knuth testified that he examined this area and found it to be a breeding ground for flies which he said were there in quantities exceeding 1,000,000. Dr. Knuth also testified that many of these flies were of the type harmful and vexatious to man. He stated that these flies could and probably did fly over to the club and other areas especially when the smell of food was prevalent such as at a barbeque.

Dr. Jones testified that so long as the present system was utilized by the defendant to dispose of the fecal matter of the cattle the problems which now exist would continue. He further testified that the defendant could install a spray irrigation system or a system of lagoons and dispose of the waste in an efficient and odorless manner. In the spray irrigation system, the concrete surface would be washed down continuously by streams of water and it was estimated that this would take about 750,000 gallons per day. The cows walking in the water would mix it with the manure so that it would liquify, float down the concrete slab to the gutters and into a large holding tank outside of the south end of the concrete slab where it would be pumped into an irrigation system which would spray the defendant's field. This system, according to Dr. Jones, would allow the manure to decompose aerobically and without odor. Aerobic decomposition is where the waste decomposes

with oxygen and the foul smelling odors which accompany anaerobic decomposition are not present. As an alternative, Dr. Jones suggested the same type of wash-down with a system of lagoons or ponds into which the liquid waste would flow, as opposed to a holding tank, where it would decompose with oxygen and without odor. According to this expert, the method now used by the defendant is not only odorous but highly uneconomical. He stated that grants from the federal government would be available to the defendant to convert the present system into a less odorous and more economical system.

H. S. Buchanan's defenses in this lawsuit are primarily twofold. First, he contends that the odor which originally accompanied the operation at the time the feed lot opened has now abated to a point where people of ordinary sensibilities no longer are offended by it. Second, the defendant contends that he has been conducting a feed lot operation in the same general vicinity since 1951 and had a sizable operation on the property prior to the time the plaintiffs started any development around the area in the form of a country club, school or residential subdivision. In support of these contentions, the defendant states that there are many acts which the owner of land may lawfully do, and although these acts bring annoyance, discomfort or injury to a neighbor, the neighbor still does not have a cause for legal redress against the particular landowner. The defendant cites in support of his contention Beckman v. Marshall, 85 So.2d 552 (Fla. 1966.) The defendant has also stated that when people move into an area they are bound to accept the agricultural pursuits carried on in the area or which, under reasonable circumstances, they might expect to be carried on in an area by reason of its history. For this proposition, the defendant has cited Dill v. Excell Packing Company, 331 Pac. 2d 539.

The plaintiffs, on the other hand contend, that although the stench is not as powerful, nauseous and overwhelming as it was when the defendant first opened his feed lot that it has, nevertheless, been powerful, unpleasant, frequent and a definite nuisance to them in the use of their property and their facilities. The plaintiffs state that the value of their property has been depreciated because of this smell, that orderly sales of their residential subdivision have been inhibited, and the members of the country club contend that the smell definitely interferes with their outdoor activities, some of which are carried on the year around and some of which occur during the more pleasant weather periods. Also, plaintiffs take the position that the original method of operation by the defendant on the sand feed lot caused no problems between themselves and the defendant. They contend that the erection by the defendant

of the totally new facility on the property and the adoption of an entirely new method of doing business was the thing which caused the problems which now persist. The plaintiffs contend that, in reality, they were there before Buchanan started the operation which they say is in reality an industrial enterprise and which they find to be a nuisance and obnoxious. The plaintiffs state that their facilities were actually completed before Buchanan began operation of the present "feed lot" facility and therefore his argument about being there first is invalid. The plaintiffs, at the time of trial, relied upon to sustain their position Knowles v. Central Allapattae Properties, 198 So. 819 (Fla. 1940), the decision in Belote v. Slye, 206 So.2d 276 (Fla. D.C.A. 1st 1968), and other provisions of the general law cited in 18 A.L.R. 2d 1025, 2 A.L.R. 3rd 931, and 2 A.L.R. 3d 965.

From the testimony which has been summarized above, this court finds as a matter of fact that the defendant, H. S. Buchanan, in effect, commenced a new and significantly different feed lot operation in late 1966. This was after the Golden Hills clubhouse had been completed, the Golden Hills Academy was completed and operating, several residences had been erected in the subdivision, at least some of the golf course was completed and all the major planning for the development had been finished. At this time, there was a collective investment in the country club, the golf course, the residences, Golden Hills Academy and related facilities in excess of $1,000,000.

Further, the defendant consistently feeds on his facility some 2,000 to 2,500 cattle. These cattle deposit daily on the concrete area approximately 160,000 pounds of wet manure which equals that produced by approximately 40,000 humans. Much of this fecal matter deteriorates and decomposes without oxygen which causes foul smelling fecal odors to rise from it in the form of gases. These gases are carried by wind currents for distances sufficient to reach the lands, places of employment and habitation of the plaintiffs and others in the surrounding area.

Also, the court finds that on at least one portion of the defendant's property, located to the south of the feed lot facility, there exists a pond or low area where fecal matter is deposited at various times because of an overflow of defendant's existing tank facilities. This area was, at the time of trial, a breeding ground for various types of flies, some of which are harmful to man, which mature to a stage of life and attain sufficient strength to allow them to reach portions of plaintiffs' facilities. These flies number in the millions or are of a sufficient quantity to cause the plaintiffs discomfort and to interfere with them in the ordinary use of their property.

It is the further finding of this court that the odor and flies are generated as a direct result of the manner in which the defendant carries on his present operations at the feed lot facility. The odor and flies are a nuisance to the plaintiffs and others in the Golden Hills development. They have inhibited the plaintiffs' real estate development, made the use of the houses and the club facilities annoying, embarrassing, unpleasant and have limited their use. The defendant can modify his use of the facility so that the odors and flies are not a nuisance to the plaintiffs and other surrounding property owners and still operate his business at a level which will not destroy or ruin it. However, continued use of the facility in the same manner as the defendant previously has done will cause irreparable injury to the property of the plaintiffs, inhibit their enjoyment of it and cause them annoyance, embarrassment and harrassment.

### Conclusions of law

The court is of the opinion that this case is controlled by the principles of law stated in Jones v. Trawick, 75 So.2d 785 (Fla. 1954), and the more recent decision of the Third District Court of Appeal in City of Miami v. City of Coral Gables, 233 So.2d 7 (1970). In the latter case, residents of the city of Coral Gables were complaining of the smell and smoke coming from a garbage incinerator operated by the city of Miami. The lower court enjoined the city of Miami from utilizing the incinerator in the manner in which they had previously done and stated —

> This court recognizes that the law of private nuisance is bottomed on the fundamental rule that every person should use his own property as not to injure that of another . . .

> Anything which annoys or disturbs one in the free use, possession or enjoyment of his property, or which renders its ordinary use or occupation physically uncomfortable is a "nuisance" and may be restrained . . .

> No doubt the instant litigation is representative of an entire assault by the people of this nation in response to the "crimes against the environment" which have been perpetrated by the users of our amassed technologies. Recognition of the public's right to pure air, soil, and water has been forthcoming from a vast segment of the governmental agencies entrusted to protect these interests for our country's people, and the legal community is now mobilizing itself to pursue the avenues of relief available...

In the judgment of this court there is little doubt that the plaintiffs in this case have been annoyed and disturbed in the free use, possession and enjoyment of their property and that its ordinary

12

use has been accompanied by physical discomfort. Further, it is this court's opinion that the annoyance and disturbance which the plaintiffs have suffered and the discomfort which they have suffered have been a direct result of the manner in which the defendant operated his feed lot facility on the adjacent lands.

Therefore, it is the judgment of this court — (1) That the defendant, H. S. Buchanan, be and he hereby is restrained and enjoined from further conducting the feed lot facility, which has been the subject of this litigation, in a manner which causes odors, flies or other conditions which annoy, harrass or cause discomfort to the plaintiffs in the ordinary and free use, possession or enjoyment of their property. (2) The defendant is given a period of ninety days within which to modify his present feed lot facility and operations so that they will comply with the order of this court.