IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,274

RODNEY L. ROSS and TONDA R. ROSS;
RODNEY L. ROSS, as Trustee of CAROL J. ROSS REVOCABLE TRUST;
RODNEY L. ROSS, as Trustee of MAYNARD O. ROSS REVOCABLE TRUST;
and LAURA E. FIELD, as Trustee of LAURA E. FIELD TRUST NO. 1,
*Appellees*,

v.

NORMAN TERRY NELSON; STILLWATER SWINE, LLC;
HUSKY HOGS, LLC; and NTN, L.P.,
*Appellants.*

SYLLABUS BY THE COURT

1.

A person who owns the fee to land dedicated to a highway easement retains all rights in the land not included in the easement, including rights above, on, and under the surface of the ground within the limits of the highway. Such rights are subject only to the condition that the owner does not interfere with the public's use of the easement. The owner has standing to sue for an alleged trespass based on uses outside the scope of the easement.

2.

The scope of a public highway easement is limited to public uses that facilitate the highway's purposes of travel, transportation, and communication.

1

3.

The permanent occupation of a portion of a public highway easement for private and exclusive use is inconsistent with the public nature of the easement and thus falls outside the easement's scope.

4.

K.S.A. 2-3202(a) creates a statutory presumption that agricultural activities do not constitute a nuisance when the statute's several requirements are met. To receive the benefit of that presumption, the nuisance must arise from an agricultural activity, the activity must be conducted on farmland, the activity must have been established prior to surrounding agricultural and nonagricultural activities, and the activity must be consistent with good agricultural practices.

5.

K.S.A. 2-3202(a)'s statutory presumption is rebuttable. Even if the requirements for invoking the presumption are met, the presumption does not attach when the activity has a substantial adverse effect on public health and safety.

6.

K.S.A. 2-3202(b) creates a presumption that an agricultural activity is consistent with good agricultural practices when it is undertaken in conformity with federal, state, and local laws and rules and regulations.

7.

A statutory reference to Kansas law includes the Kansas common law.

Review of the judgment of the Court of Appeals in 63 Kan. App. 2d 634, 534 P.3d 634 (2023). Appeal from Phillips District Court; PRESTON A. PRATT, judge. Oral argument held May 8, 2024. Opinion filed August 23, 2024. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Patrick B. Hughes*, of Adams Jones Law Firm, P.A., of Wichita, argued the cause and was on the briefs for appellants.

*Randall K. Rathbun*, of Depew Gillen Rathbun & McInteer LC, of Wichita, argued the cause, and *Braxton T. Moral*, of the same firm, was with him on the brief for appellees.

*Aaron M. Popelka*, vice president of legal and governmental affairs, and *Jackie Newland*, associate counsel, Kansas Livestock Association, and *Terry D. Holdren*, general counsel, and *Wendee D. Grady*, assistant general counsel, Kansas Farm Bureau, were on the brief amici curiae.

The opinion of the court was delivered by

WALL, J.:  Norman Terry Nelson runs an industrial hog-farming operation a few miles east of Almena, a small town in northwest Kansas near the Nebraska border. The hogs generate enormous volumes of waste. To manage that waste, Nelson decided to use it as fertilizer on his farmland. So he piped treated waste from his facilities to his nearby farmland, where he used a pivot irrigation system to spray it onto the fields.

But this arrangement has ruffled more than a few feathers—or should we say wrinkled more than a few noses. Two neighbors sued for trespass and nuisance. They prevailed in the district court and on appeal. Nelson now asks us to overturn these judgments, arguing that he needed no permission to install the pipelines and invoking Kansas' right-to-farm statutes to shield him from nuisance liability. We decline.

3

Nelson exceeded the scope of the public easement by installing pipelines beneath a public road for his private and exclusive use. Because the landowners did not authorize this installation, Nelson committed a trespass. This trespass, in turn, precludes him from relying on the presumption of "good agricultural practice" under the right-to-farm statutes. To rely on that presumption, the statute requires conformity with all applicable laws, a condition Nelson's trespass violates. The lower courts correctly applied these principles, and we affirm their judgments.

FACTS AND PROCEDURAL BACKGROUND

Nelson's neighbors, Rodney and Tonda Ross and Laura Field, sued Nelson and his corporate entities. They alleged that Nelson had trespassed on their land by installing pipes in the subsurface of the county road. Those pipes carry the treated pig waste (effluent) from his facilities to his farmland, and water from the farmland to the facilities. According to their petition, the plaintiffs owned the land the road was located on, and they had not given Nelson permission. The petition also alleged that Nelson had created a nuisance for the Rosses. They own a farmhouse that sits just across the road from the cropland where Nelson sprays the effluent. They alleged that the resulting odors and fly infestations had unreasonably interfered with their use and enjoyment of that property. To simplify matters, we follow the lead of the district court and use "Ross" to denote all the plaintiffs and "Nelson" to denote all the defendants.

Nelson moved for partial summary judgment on both the trespass and nuisance claims. On the trespass claim, Nelson argued he needed no permission to lay pipelines along the county road. And if he did, he had the implied consent of the county. Ross insisted that only public utilities could install pipelines in the highway easement without permission from the landowner. And he filed his own motion for summary judgment on the trespass claim. On the nuisance claim, Nelson argued that the right-to-farm statutes

4

shielded his conduct from nuisance liability. Ross maintained that the statutory right-to-farm protections did not apply because Nelson's agricultural activity violated the applicable laws and regulations.

The district court granted Ross summary judgment on the trespass claim after concluding that Nelson needed Ross' permission to install the pipelines. The court also denied Nelson's motion for summary judgment on the nuisance claim after ruling that he was not entitled to the statutory presumption under K.S.A. 2-3202(b). Under that provision, conduct is presumed to be a "good agricultural practice"—which is one of the conditions for invoking the right-to-farm protections—if the conduct is "undertaken in conformity with federal, state, and local laws and rules and regulations." But since Nelson had trespassed on Ross' land, the district court concluded that his conduct failed to conform to state law. Thus, he was not entitled to the statutory presumption.

After a four-day trial, the jury awarded Ross damages on the trespass claim, found in his favor and awarded him damages on the nuisance claim, and found that Nelson's conduct warranted punitive damages, which the district court later awarded. On appeal to the Court of Appeals, Nelson challenged "several aspects of the district court's summary-judgment rulings on the trespass and nuisance claims, the jury verdicts on each, and the $50,000 punitive-damage award." *Ross v. Nelson*, 63 Kan. App. 2d 634, 643, 534 P.3d 634 (2023). The Court of Appeals panel held that Nelson had failed to show error, so it affirmed the district court's judgment. 63 Kan. App. 2d at 643.

Nelson petitioned our court for review of the panel's trespass and nuisance rulings, but he did not renew his challenge to the punitive-damages award. We granted Nelson's petition and heard oral arguments on Wednesday, May 8, 2024. Jurisdiction is proper. See K.S.A. 60-2101(b) (providing for Kansas Supreme Court review of Court of Appeals decisions).

ANALYSIS

I.  *Ross Was Entitled to Summary Judgment on the Trespass Claim*


We first address whether Nelson trespassed by installing pipelines in the subsurface of several county roads without Ross' permission. Ross owns the land on which the county roads are located. Both parties acknowledge the roads at issue are public highways. See L. 1874, ch. 111, § 1 (declaring all section lines in Norton County to be "public highways"). In Kansas, owners of real property containing a public highway generally retain fee title to the land. But the public obtains an easement over the land for travel and transportation. *Comm'rs of Shawnee Co. v. Beckwith*, 10 Kan. 603, 607-08, 1873 WL 699 (1873). Thus, Ross owns the fee to the land. But the public has a right to use the portion of Ross' land dedicated to the road for travel and transportation.


Nelson asserts he did not trespass on Ross' land. He argues that his use of the road—installing and operating a pipeline system—falls within the permissible scope of the highway easement. And such uses do not require landowner permission. But both the district court and the Court of Appeals disagreed. They concluded that Nelson exceeded the scope of the public highway easement by installing a pipeline in the road exclusively for his private use. Thus, Nelson needed Ross' permission, which he did not have. *Ross*, 63 Kan. App. 2d at 644, 651.


On review, Nelson challenges the lower courts' holdings on several grounds. First, he argues Ross lacks standing to bring a trespass claim because Ross does not have a possessory interest in the highway easement. Second, Nelson renews his argument that installing pipelines below the road's surface is a permissible use of a highway easement because it facilitates transportation. Nelson believes this to be true even if the pipelines were not a public use. And even if his use exceeds the scope of the easement, Nelson argues he had the implied consent of the county to install the pipelines. To resolve these

6

issues, we first discuss the facts that frame the legal challenges. Then, we outline the controlling legal framework before addressing Nelson's standing argument and his challenges on the merits.

A. *Additional Facts Necessary to Frame Nelson's Challenge*

According to the summary-judgment record, a Norton County resolution requires anyone desiring to install a pipeline in a county road to obtain a permit before starting any work. Sometime in August 2017, Nelson applied for a permit to install three pipelines in the rights-of-way of several county roads. The application was undated, and the signature line for the county clerk to approve the permit was unsigned.

That month, Nelson attended a meeting of the Norton County Board of County Commissioners. Nelson said he wanted to install two freshwater pipelines and one effluent pipeline in the county road rights-of-way for a new hog unit. He also told the commissioners he had contacted the landowner's tenant. An employee of the Norton County Road Department explained that the roads would need to be elevated and that the existing fencing would need to be moved to accommodate the pipelines. The commission approved that road construction.

County employees completed the roadwork to accommodate Nelson's pipelines in late August 2017. But early the next month, the Norton County sheriff received word that Nelson was installing pipelines without the necessary permits. The sheriff told Nelson's employee that it would be in Nelson's best interest if the installation stopped.

At a Board of County Commissioners meeting held a few days later, Nelson asked why permits were needed to use county road rights-of-way. The commissioners said the permits were necessary so pipelines could be located for safety and maintenance purposes. Someone at the meeting asked why road work had started when the permit had

not been issued. Apparently, the commissioners believed Nelson had received permission from the landowners. But the commissioners later received a letter from one landowner stating that she had never been contacted. At the time of that meeting, the permit had not been signed. But Nelson still believed he had the county's permission to proceed.

Nelson installed the pipelines. Ross sued Nelson for trespassing. And both Nelson and Ross moved for summary judgment on that claim.

The district court granted summary judgment to Ross on the trespass claim. It found the following facts were uncontroverted:

> "Nelson owns a hog confinement facility. Nelson transports water to the facility, and liquified hog waste from the facility, via pipes buried along a county road in the road right of way. Ross owns land adjoining the road where the pipes are buried. At the beginning of oral argument all parties agreed that Nelson is a private entity, not a public utility. They also agreed Ross owns the fee to the road. They also agreed that Nelson did not acquire Ross's permission before installing the pipeline in the road right of way."

The district court noted that Kansas law requires individuals to obtain landowner permission before using a public highway easement for private purposes other than traveling on road surfaces. The district court found that Nelson had buried the pipelines below the roads' surfaces exclusively for his private benefit. Thus, it concluded that he needed Ross' permission to do so. The parties agreed that Nelson did not have Ross' permission. So the district court ruled that Nelson was trespassing as a matter of law.

The Court of Appeals affirmed the district court's judgment. *Ross*, 63 Kan. App. 2d at 651. The panel held that a private person may install a pipeline in a public highway right-of-way if the pipeline has a public use—"like providing a utility to the community." 63 Kan. App. 2d at 651. If it does not, the person must get permission from either the landowners or the Legislature, depending on the nature of the installation and

8

the property. 63 Kan. App. 2d at 645-46, 651. The panel affirmed the district court's ruling because Nelson installed the pipelines for a private purpose without permission from the landowners or the Legislature. 63 Kan. App. 2d at 646-51.

The panel also rejected Nelson's argument that Ross lacked standing. Nelson argued that a landowner's right to possess a public highway easement is limited. And he believed these limited interests did not give Ross authority to sue for trespass. But the panel disagreed. It held that Ross, as the abutting landowner, has a distinct property interest in the land that other members of the public do not. 63 Kan. App. 2d at 650-51.

On review, Nelson renews his argument that Ross lacks standing to bring a trespass claim. And on the merits, he argues that his use falls within the scope of the easement—no matter who is installing the pipeline or whether the pipeline is only for private use—because a pipeline is a method of transporting property. After identifying the controlling legal framework, we address both issues in turn.

B. *Appellate Courts Use the Same Summary Judgment Standard as the District Courts*

The legal standard for summary judgment is well-established:

> """Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case.""" *Fairfax Portfolio LLC v. Carojoto*, 312 Kan. 92, 94-95, 472 P.3d 53 (2020).

We apply these same rules when reviewing an order granting summary judgment. 312 Kan. at 94.

We have unlimited review over an order granting summary judgment. 312 Kan. at 94. Likewise, our review is unlimited when addressing standing because the issue implicates the court's jurisdiction. *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 751, 189 P.3d 494 (2008). And when the material facts are undisputed, we also have unlimited review when deciding the appropriate scope of an easement. *Stroda v. Joice Holdings*, 288 Kan. 718, 720, 207 P.3d 223 (2009).

### C. *Ross Has Standing to Sue Nelson for Trespass*

Nelson first claims that Ross lacks standing to bring a trespass claim—that is, Ross lacks a personal stake in the outcome of this case. See *Baker v. Hayden*, 313 Kan. 667, 672, 490 P.3d 1164 (2021) (Standing "means the party must have a personal stake in the outcome."). Standing is a component of subject-matter jurisdiction. 313 Kan. at 673. So, if Ross lacks standing, the courts lack jurisdiction to adjudicate Ross' trespass claim. And while Nelson did not raise this issue before the district court, a party may challenge the court's subject-matter jurisdiction at any time. 313 Kan. at 673.

Nelson's standing challenge turns on whether Ross can show he personally suffered an injury due to Nelson's actions. See *City of Wichita v. Griffie*, 318 Kan. 510, 516, 544 P.3d 776 (2024) ("Under Kansas' traditional standing test, parties must demonstrate they *personally* 'suffered a cognizable injury' and 'a causal connection between the injury and the challenged conduct.'"). A trespass occurs when a person "enters the premises of another without any right, lawful authority, or express or implied invitation or license." *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 22, 378 P.3d 1090 (2016). Put another way, a trespass occurs when a person "enters or

10

remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise." *Riddle Quarries, Inc. v. Thompson*, 177 Kan. 307, 311, 279 P.2d 266 (1955). Thus, to have standing to sue for trespass, Ross must have a property interest—such as ownership or possession—in the land in which Nelson installed the pipelines.

Nelson contends Ross has no private interest in the land subject to the easement because highway easements belong to the public. But highway easements, like other easements, create only a nonpossessory right to enter and use land in the possession of another. See *Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93, 105, 134 S. Ct. 1257, 188 L. Ed. 2d 272 (2014) ("An easement is a 'nonpossessory right to enter and use land in the possession of another . . . .'"). When a public highway is created, "nothing connected with the land passes to the public except what is actually necessary to make the road a good and sufficient thoroughfare for the public." *Beckwith*, 10 Kan. at 607. The public has only the right to use the highway for travel and transportation and "obtains only so much of the land, soil, trees, etc., as is necessary to make a good road." 10 Kan. at 607. This includes subsurface rights that promote the public's use of the easement. See *City of Chandler v. Ariz. Dept. of Transp.*, 224 Ariz. 400, 403, 231 P.3d 932 (Ct. App. 2010) ("Generally, a roadway easement includes any subsurface rights incident to use of the surface."); *Harlingen Irr. Dist. v. Caprock Commun.*, 49 S.W.3d 520, 527 (Tex. App. 2001) ("Roadway easements include the use of the subsurface for sewers, pipelines and other methods of transmission and communication that serve the public interest.").

When, as is the case here, land is bounded by a public highway easement, the landowner owns the fee up to the center of the road. See *Mall v. C. & W. Rural Electric Co-operative Ass'n*, 168 Kan. 518, 521, 213 P.2d 993 (1950) (after township road was created on land, the public acquired only an easement for highway purposes and the landowner "continued to own the fee to the center line of the township road"). And the

11

landowner "continues to own the trees, the grass, the hedges, the fences, the buildings, the mines, quarries, springs, watercourses, in fact everything connected with the land over which the road is laid out, which is not necessary for the public use as a highway." *Beckwith*, 10 Kan. at 607-08. The landowner may continue to use the land in any way so long as he or she does not interfere with the public's use of the highway easement. 10 Kan. at 608. "In fact, the original owner has as complete and absolute dominion over his land, and over everything connected therewith after the road is laid out upon it, as he had before, except only the easement of the public therein." 10 Kan. at 608; see also 3 Nichols on Eminent Domain § 10.02[1][d] (3d ed. rev. 2010) ("The land owner may make every use of the land within the limits of the highway, above, upon, or below the surface of the ground, that does not interfere with the public easement as it is actually exercised . . . .").

Here, Ross owns the fee to the land dedicated to the highway easement up to the center of the road. He retains all rights in the land not included in the easement—including rights above, on, and under the surface of the highway. And those rights are subject only to the condition that he does not interfere with the public's use of the easement. "As against everything but a proper exercise of [a highway] easement, the rights of the owner of the fee are absolute; the owner may maintain a trespass action or an ejectment action against a stranger who makes an unwarranted use of the way." 3 Nichols on Eminent Domain §10.02[d] (3d ed. rev. 2010); see also *Mayor and City Council of Baltimore v. United States*, 147 F.2d 786, 788 (4th Cir. 1945) (when land is dedicated to a city for use as a street, the abutting fee owner retains substantial rights in the land and may maintain actions for trespass and ejectment); *Hark v. Lumber Co.*, 127 W. Va. 586, 597, 34 S.E.2d 348 (1945) (placing private tramway in a public road on plaintiff's land without legal authority constituted trespass). Thus, Ross has a private property interest in the subsurface of the highway. And he has standing to sue for trespass based on allegations that Nelson's use was outside the scope of the easement.

Nelson cites several cases to support his claim to the contrary. But these cases are distinguishable.

First, Nelson cites *Ruthstrom v. Peterson*, 72 Kan. 679, 83 P. 825 (1905). There, the court held that an abutting landowner had no right to an injunction restraining the defendant from fencing up one side of a public highway. The fence did not obstruct the side of the road belonging to the landowner or prevent him from accessing his land. So the landowner based his claim only on his right to travel on the highway. But that right was no different from the public's right. 72 Kan. at 680. The court held that the landowner was not entitled to relief because "an injunction will not be granted at the suit of a private citizen to protect public interests." 72 Kan. at 680. From this, Nelson concludes that Ross has standing to bring a claim only if the pipelines interfered with his right of access to the easement.

But unlike the landowner in *Ruthstrom*, Ross is not suing to enforce a public right. He is not claiming that Nelson interfered with the public's use of the easement. Rather, Ross alleged that Nelson's use of the subsurface of the road exceeded the scope of the highway easement. And as the fee owner, Ross retains all rights in the land not included in the easement, including rights to the subsurface. See *Beckwith*, 10 Kan. at 607-08; *Hale County v. Davis*, 572 S.W.2d 63, 66 (Tex. Civ. App. 1978) (recognizing fee owner of land subject to road had "the right to the undisturbed possession and use of the subsurface"). If Nelson's use of the subsurface is outside the scope of the highway easement, then it violates Ross' private property rights. Thus, Ross' claim is based on an enforceable private interest, not a public right. This fact distinguishes the case from *Ruthstrom*. See *Hark*, 127 W. Va. at 595-97 (recognizing plaintiffs could not bring claim in private capacity to abate public nuisance, but finding that plaintiffs, as fee owners, could seek injunction to restrain private use of public highway easement as such use constituted trespass on plaintiffs' land).

13

Second, Nelson cites *State v. Natural-gas Co.*, 71 Kan. 508, 80 P. 962 (1905). There, the court explained that a landowner "has no power to transfer to another any right to occupy the highway for any purpose." 71 Kan. at 509. Nelson reasons that if a landowner cannot grant another the right to occupy a highway easement, then the landowner must also lack standing to bring a trespass claim based on a party's occupation of the easement. But Nelson misconstrues *Natural-gas Co.*

In *Natural-gas Co.*, the State tried to prevent a gas company from installing pipelines in a public highway. The company argued it had a right to occupy the highway because it had obtained permission from the abutting fee owners. The court rejected that argument because an abutting fee owner cannot authorize uses that interfere with the public's use of the easement:

> "The right of the gas company to bury its pipes in the public highway for the transportation and distribution of gas depends largely upon the effect such use would have on the subsequent use of the highway as a thoroughfare for public travel. It may be said that the gas company could not, and did not, as against the state, obtain from the abutting fee-owners any right to use the public highway for any purpose. Its use belongs to the public and not to the owners of adjoining property. It is true that there are some privileges which such an owner may exercise for the betterment of the adjacent estate, but he has no power to transfer to another any right to occupy the highway for any purpose." 71 Kan. at 509.

*Natural-gas Co.* does not suggest that individuals who own land subject to a highway easement cannot bring trespass claims when a person's use exceeds the scope of the easement.

Finally, Nelson cites *Ruby Drilling Co., Inc. v. Billingsly*, 660 P.2d 377 (Wyo. 1983). There, the Wyoming Supreme Court held that homeowners in a subdivision lacked a sufficient possessory interest to bring a trespass claim based on a water line installed in

14

the right-of-way of a subdivision road. But the homeowners in *Billingsly* "claimed no ownership rights to the roadway." 660 P.2d at 381. Thus, they lacked any private property interest sufficient to support a trespass claim. But here, Ross owns the fee to the land subject to the easement. So *Billingsly* is not on point.

In short, Ross owns the fee to the subsurface of the road and retains all rights in the subsurface not included in the easement. He alleged and offered supporting evidence that Nelson's use constitutes a trespass because it exceeds the scope of the highway easement. Thus, Ross has a real-property interest that gives him legal standing to bring a trespass claim against Nelson.

D. *Nelson Committed Trespass as a Matter of Law*

Nelson next argues that the lower courts erred by concluding that his use of the roadway easement constituted a trespass. The issue turns on whether Nelson's decision to install pipelines in the subsurface of the county roads fell within the scope of the public highway easement. If not, Nelson needed permission from Ross. And without such permission, Nelson would have committed trespass as a matter of law.

To decide whether Nelson had a right or lawful authority to install the pipelines, we first consider the scope of the public highway easement. Caselaw confirms that the scope of this easement is limited to public uses facilitating the highway's purposes— travel, transportation, and communication. Second, we consider whether Nelson's use fell within the permissible scope of the easement. We conclude it did not because the pipelines were permanent structures intended for Nelson's private and exclusive use. Finally, we consider whether Nelson had any other lawful authority for this use. We conclude he did not because Ross did not give permission and the county had no authority to permit a private use of the roads' subsurface.

15

1. *The Scope of a Highway Easement Is Limited to Public Uses that Facilitate the Highway's Purposes*

When a public highway is established over privately owned land, the public obtains an easement for travel, transportation, and communication. *Beckwith*, 10 Kan. at 607; *McCann v. Telephone Co.*, 69 Kan. 210, 213, 76 P. 870 (1904). In the early years of Kansas' statehood, the use of highway easements generally involved only travel across the surface of the road. See *Beckwith*, 10 Kan. at 607 (public "obtains the right . . . to pass and repass, and to use the road as a public highway only"); *Caulkins v. Mathews*, 5 Kan. 191, 200, 1869 WL 422 (1869) ("Men may pass and repass with their stock upon the public highways, but we think that that is the extent of their right."). And such use was plainly within the scope of the easement, regardless of the means. See *Natural-gas Co.*, 71 Kan. at 509 (recognizing that while "the means of travel were on foot or on the backs of beasts" when public roads first came into use, "[i]t could not . . . be held that the highway could not be used for the transportation of passengers and for traffic by automobiles").

In later years, our court considered whether highway easements permitted uses other than traveling over the road's surface. In deciding whether such uses fell within the scope of the easement, the court generally considered two criteria. First, did the proposed use directly relate to the purpose of the highway easement? That is, did the use facilitate travel, transportation, or communication? And second, was the proposed use a public one?

For example, in *McCann*, this court considered whether the placement of telephone poles for a telephone line is a "contemplated and appropriate use of a highway." 69 Kan. at 212. It noted that "[t]he highway is established for the use of the public, and the telephone line is not only a public convenience, but it is a recognized public use." 69 Kan. at 212. The court further acknowledged that a highway's purpose is

16

"for passage, travel, traffic, transportation, transmission, and communication." 69 Kan. at 213. Thus, *McCann* held that installing telephone poles was a permissible use of the highway easement because the telephone line was a public means of communication. 69 Kan. at 219.

The next year, in *Natural-gas Co.*, the court held that burying gas pipelines for the transportation and distribution of gas for light, fuel, and power was a proper use of a highway easement. The court reasoned that "'the production and distribution of natural gas for light, fuel and power is a business of a public nature.'" *Natural-gas Co.*, 71 Kan. at 509 (quoting *La Harpe v. Gas Co.*, 69 Kan. 97, Syl. ¶ 1, 100, 76 P. 448 [1904]). And the pipelines transported commodities, which is one of the purposes of a highway. 71 Kan. at 509.

Several years later, the court held that installing electric lines was a permissible use of a highway easement. See *State, ex rel., v. Weber*, 88 Kan. 175, 180-81, 127 P. 536 (1912). In *Weber*, the court recognized that the Legislature may regulate use of a highway easement. But in the absence of any contrary regulation, the highway "was open for any proper public use which the people might choose to make of it." 88 Kan. at 178. And we concluded, that "[t]he transmitting and carrying of light, heat and power over and along a highway for distribution among consumers is a public use as well as one of the proper uses of a highway." 88 Kan. at 178.

Nelson insists the takeaway from *McCann*, *Natural-gas Co.*, and *Weber* is that a proposed highway use need only facilitate travel, transportation, or communication. And the use need not be a public one. But this reading is too narrow. These decisions considered both whether the use fit the purpose of a public highway and whether it served a public use or benefit. See, e.g., *Weber*, 88 Kan. at 178 (recognizing transmission of light, heat, and power along highway for distribution among consumers is a public use and the electric line is a public utility); *Natural-gas Co.*, 71 Kan. at 509 (recognizing that

companies distributing gas are quasi-public and that distributing gas is a public business); *McCann*, 69 Kan. at 212 (recognizing "[t]he purpose of a telephone . . . is a public one" and Legislature has authorized telephone companies to maintain lines in highways and granted them power of eminent domain).

This view is not an outlier. Other jurisdictions have likewise held that any proposed use of a highway easement must serve the public interest or have a public benefit. See *Bello v. ABA Energy Corp.*, 121 Cal. App. 4th 301, 315-16, 16 Cal. Rptr. 3d 818 (2004) (to fall within the scope of a highway easement, a proposed use must "serve either the public interest or a private interest of the underlying landowner that does not interfere with the public's use rights"); *Bentel v. County of Bannock*, 104 Idaho 130, 134, 656 P.2d 1383 (1983) ("It is clear from the contract that the City of Pocatello will derive a direct and substantial benefit from construction of the pipeline, and that public benefit makes construction of the pipeline allowable within the scope of the county's public easement."); *New England Tel. & Tel. Co. v. Boston Terminal Co.*, 182 Mass. 397, 399, 65 N.E. 835 (1903) ("The permanent structures above referred to [including water and gas pipes] are permitted because they are used by the public or a part of the public, or are held and used in private ownership for the benefit of the public."); *Cater v. Northwestern Telephone Exchange Co.*, 60 Minn. 539, 546, 63 N.W. 111 (1895) ("No such structures [as telephone and telegraph lines] can be put in the highways except by authority of the state, and then only for a public use."); *Vertex Holdings, LLC v. Cranke*, 217 P.3d 120, 126 (Okla. Civ. App. 2008) ("[A] private use of [a public road] easement is . . . an additional servitude requiring consent of and compensation to parties owning the fee interest below the roadway."); *46 S. 52nd St. Corp. v. Manlin*, 398 Pa. 304, 314, 157 A.2d 381 (1960) ("[A] purely private use of the public highway with no reasonable benefit to the public generally not only may be prevented by the municipality, but is not even permissible."); *McCullough v. Interstate Power & Light Co.*, 163 Wash. 147, 150, 300 P. 165 (1931) (holding transmission of electricity for distribution among consumers is a public use and proper use of highway, and noting that jurisdictions that held transmission

18

of electricity was not proper use of highway did so because those jurisdictions did not consider it a public use); *Hark*, 127 W. Va. at 595 ("A public easement lawfully acquired cannot be broadened to include a private and exclusive right.").

Nelson believes that two Kansas Supreme Court decisions undercut this conclusion. But these decisions do little to advance Nelson's cause.

In *Thompson v. Traction Co.,* 103 Kan. 104, 106, 172 P. 990 (1918), and *Murphy v. Gas & Oil Co.*, 96 Kan. 321, 329, 150 P. 581 (1915), the court stated that the corporate defendants had a right to lay oil and gas pipelines in a highway, even though the pipelines were ostensibly for private purposes. But the issue in both *Thompson* and *Murphy* was whether the defendants were negligent in installing the pipelines. The court did not directly consider the permissible scope of the highway easement in either case. Nor did the plaintiffs argue that the defendants exceeded the scope of the easement by installing the pipelines. Thus, these decisions carry little weight—especially when compared to our precedent squarely addressing the scope of a highway easement.

Furthermore, both *Thompson* and *Murphy* involved the installation of pipelines to transport gas or oil. And both cases cited *Natural-gas Co.* for the rule that gas and oil pipelines may lawfully be laid along a public highway. *Thompson*, 103 Kan. at 106; *Murphy*, 96 Kan. at 329. *Natural-gas Co.* developed this rule based on the public nature of the gas-distribution industry. See *Natural-gas Co.*, 71 Kan. at 509; see also *La Harpe*, 69 Kan. at 100 ("The production and distribution of natural gas for light, fuel and power affect the people generally to such an extent that the business may be regarded as one of a public nature, and is almost, if not quite, a public necessity."). The defendants in *Thompson* and *Murphy* were similarly regarded as businesses of a public nature.

19

In sum, to fall within the scope of a public highway easement, any proposed use must generally be a public use that facilitates the highway's purposes of travel, transportation, or communication. This rule is grounded in our caselaw and buttressed by authority from other jurisdictions.

### 2. *Nelson's Pipeline Exceeded the Scope of the Public Highway Easement*

Having determined the scope of a highway easement, we now consider whether Nelson's use fell within that scope. That is, did Nelson's pipelines constitute a public use that facilitated one of the highway's purposes? This court has determined that pipelines are a means of transporting products—one of the purposes of a highway easement. See *Natural-gas Co.*, 71 Kan. at 509. Thus, the focus of our analysis is on whether Nelson's use was a public one.

Nelson contends that as a member of the public, he has a right to transport property along the highway. Thus, Nelson believes he is exercising that public right by installing pipelines within the easement.

He cites *Wood v. Fowler*, 26 Kan. 682, 690, 1882 WL 910 (1882), in support. There, the court held that the first individual to appropriate publicly owned ice is entitled to it. Nelson claims that like *Fowler*, he is simply the first person to appropriate use of the road's subsurface.

But an individual's right, as a member of the public, to transport property on the highway does not translate into a right to permanently appropriate a portion of the highway easement for private and exclusive use. See *Commissioner of Transp. v. Lane*, 144 Misc. 2d 680, 684, 544 N.Y.S.2d 925 (1989) (right to enter public highway "does not carry with it the right to remain or the right to appropriate a portion of the public highway to a private use which excludes all other members of the public [citations omitted]").

20

Highway easements belong to the public, and "all of the public is entitled" to use them. *Weber*, 88 Kan. at 181. But "the rights held by the public do not permit the occupancy over a long period of time of a public road by a structure privately and exclusively used." *Hark*, 127 W. Va. at 595. Permanently excluding all other members of the public from using a portion of the highway would be inconsistent with the public nature of the easement. Thus, the permissible scope of a public highway easement does not include the right to permanently occupy a portion of the highway for private and exclusive use.

Nelson also argues that his right to install pipelines in the easement without permission of the landowner or Legislature is supported by our court's decision in *Walker v. Armstrong*, 2 Kan. 198, 1863 WL 328 (1863). According to Nelson, *Walker* held that all persons have a right to land a ferry boat at the mouth of a public highway without the consent of the landowner unless the Legislature has granted an exclusive right for ferrying. 2 Kan. at 220, 225. But in *Walker*, the court assumed, without deciding, that all persons have a right to land a ferry at the mouth of a public highway without the landowner's consent. See 2 Kan. at 225 ("Without examining whether it was so—or the question raised by Armstrong's counsel whether a ferry-boat may be landed at the mouth of a public highway without the consent of the owner of the soil—but for the purpose of the argument concede both these propositions to the plaintiff."). Also, the nature of the use in *Walker* further distinguishes the decision. Landing a ferry at the mouth of a public highway is a temporary occupation of the easement. And ferries generally have a public benefit. See 2 Kan. at 220 (noting Armstrong's exclusive ferry privileges "are granted for the benefit of the traveling public, and until he is prepared to serve them he has acquired no right to prohibit others from doing so"). In contrast, Nelson wants to permanently occupy a portion of the road's subsurface for his private and exclusive use.

This is not to say that permanent structures never fall within a highway easement. Rather, such structures must promote the highway's purposes *and* serve the public. For example, telephone lines fall within highway easements because the public uses them to

21

communicate. See *McCann*, 69 Kan. at 212. And electric lines and gas pipelines fall within highway easements because the public uses them to access energy. See *Weber*, 88 Kan. at 178; *Natural-gas Co.*, 71 Kan. at 509. It is this public use or benefit that prevents these permanent structures from being viewed as improper private appropriations.

According to the uncontroverted summary-judgment evidence, Nelson's pipelines had no such public use. The evidence shows Nelson installed the pipelines to transport fresh water and effluent for his private farming business. Based on this uncontroverted evidence, the district court found Nelson's pipelines were not a public use. And the Court of Appeals affirmed this finding, explaining that Nelson "installed [the pipelines] for a purely private farming operation" and "Nelson does not run a quasi-public corporation or conduct a 'business of public nature'—one that is 'almost, if not quite, a public necessity.'" *Ross*, 63 Kan. App. 2d at 646-47 (quoting *La Harpe*, 69 Kan. 97, Syl. ¶ 1).

Nelson contests the lower courts' conclusion that his pipelines were not a public use on two grounds. We are not persuaded by either argument.

First, he argues the right to install permanent structures in a highway easement is not limited to public utilities. But neither the district court nor the Court of Appeals suggested otherwise. Rather, the Court of Appeals discussed public utilities to illustrate how a permanent fixture in a highway easement could be a public use. See *Ross*, 63 Kan. App. 2d at 645-46 (recognizing Kansas caselaw regarding the scope of highway easements often involved public utilities).

Second, Nelson argues that a public use is not mutually exclusive with his own private benefit. In other words, a permanent fixture can have both a public and private benefit. He points to Kansas eminent domain caselaw holding that the State may lawfully take property even when the taking provides a direct private benefit. But these same cases make clear that the condemnation of the property must still be for a public use. See, e.g.,

22

*State, ex rel., v. Urban Renewal Agency of Kansas City*, 179 Kan. 435, 438, 296 P.2d 656 (1956) (condemnation of private property for urban renewal project was for public use even if private individuals or corporations might profit from the undertaking).

In sum, to fall within the scope of the highway easement, it is not enough that Nelson's pipelines were a mode of transportation. They also needed to be a public use. But Nelson installed the pipelines for his private and exclusive use. Permanently occupying a portion of a highway easement for private and exclusive use is inconsistent with the public nature of the easement. Thus, Nelson's pipelines were not a permissible use of the highway easement.

3.  *Nelson Had No Other Lawful Authority to Install the Pipelines in the Subsurface of the Road*

Because Nelson's use exceeded the scope of the public highway easement, he needed some other lawful authority for the project. Otherwise, the pipelines trespass on Ross' land. See *Armstrong*, 305 Kan. at 22 (trespass occurs when person enters another's premises without any right or lawful authority).

The parties agree that Nelson did not have Ross' permission to install the pipelines. But Nelson claims he had implied consent from the county. Nelson notes that the county adopted a resolution that merely required him to register any pipelines he placed in county roads. And the county approved and completed the road construction necessary to accommodate his pipelines.

As both the district court and the Court of Appeals recognized, the parties disputed whether the county consented to Nelson's installation of the pipelines. See *Ross*, 63 Kan. App. 2d at 649. This prevented the district court from granting Nelson's motion for summary judgment on the trespass claim.

23

And even if we were to accept Nelson's assertions, it does not affect the lower courts' decisions to enter judgment for Ross. See *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (if disputed fact, however resolved, could not affect judgment, it is not a genuine issue of material fact precluding summary judgment). Quite simply, the county had no authority to permit a permanent fixture within the subsurface of the public highway easement for an exclusively private benefit. See *Hale County*, 572 S.W.2d at 65 ("[T]he county possesses no authority in law to grant an easement in the road's subsurface owned by an individual for the exclusive private use of a nonowner."); see also *Gerstley v. Globe Wernicke Co.*, 340 Ill. 270, 280, 172 N.E. 829 (1930) ("[A] municipality has no power or authority to grant the exclusive use or control of any part of the highway to any private person or for any private purpose."). In other words, the county lacks authority to authorize uses that exceed the scope of the highway easement and encumber the private property rights of the landowner. And nothing suggests that the Legislature has adopted a contrary position.

In sum, Nelson installed permanent structures—pipelines—for his private use in the subsurface of a public highway. The pipelines exceeded the scope of the public highway easement because Nelson permanently occupied the easement for his private and exclusive use, rather than a public one. Nelson's pipelines thus infringed on the private property rights of Ross—the fee owner who retained all rights in the subsurface not included within the easement. Nelson did not have Ross' permission to install the pipelines. Nor did he have permission from any other body with authority to permit the installation. Thus, Nelson committed trespass as a matter of law. And we affirm the judgments of the lower courts.

II.  *Nelson Was Not Entitled to Summary Judgment on Ross' Nuisance Claim*

We turn now to the constellation of issues surrounding Ross' nuisance claim. Unlike the trespass claim, Ross was the only plaintiff to sue defendants for nuisance. Thus, we refer to Ross individually in this section. And we continue to refer to all defendants as Nelson.

The district court denied Nelson's motion for summary judgment. The panel affirmed this ruling. The same summary-judgment standards we described above apply. See *Fairfax Portfolio*, 312 Kan. at 94. Nelson argues that he was entitled to summary judgment on that claim for two reasons.

First, Nelson argues that the odors and fly infestations that Ross complains about are legally insufficient to support a nuisance claim under our court's decision in *Dill v. Excel Packing Co.*, 183 Kan. 513, 331 P.2d 539 (1958). But we disagree that *Dill* created a general rule of nonliability. It held only that the operators of a cattle feed lot had not created a nuisance under the case-specific facts. 183 Kan. at 526.

Second, Nelson argues that spraying the effluent is shielded from nuisance liability under our right-to-farm statutes. Those statutes create a presumptive defense to nuisance claims when an agricultural practice meets certain requirements. See K.S.A. 2-3202. But we agree with the lower courts that the spraying of effluent was not "undertaken in conformity with" state law because the pipelines trespassed on Ross' land. K.S.A. 2-3202(b). As a result, Nelson is not entitled to the statutory presumption that he was engaging in a "good agricultural practice"—one of the conditions that must be met to invoke the presumption that a challenged agricultural practice is not a nuisance. See K.S.A. 2-3202(b). We explain these conclusions in more detail below, but we begin by noting a preservation issue that could potentially derail Nelson's challenge.

A. *Panels of the Court of Appeals Have Declined to Review a Denial of Summary Judgment when the Losing Party Fails to Raise the Issue at Trial, but We Decline to Apply that Rule Under the Circumstances*

In the district court, Nelson moved for summary judgment on Ross' nuisance claim, arguing that the right-to-farm statutes shielded him from liability. After the district court denied that motion, the court held a four-day trial, and the jury found Nelson liable for nuisance. But Nelson never raised the right-to-farm issue after the summary-judgment stage. He never, for example, incorporated those arguments into a motion for judgment as a matter of law under K.S.A. 60-250.

That could pose a preservation obstacle to addressing Nelson's arguments on appeal. Several Court of Appeals panels have recognized a rule that requires a party who has lost on summary judgment to "preserve legal issues or defenses for appeal by incorporating them into a trial motion for judgment as a matter of law." *Evergreen Recycle v. Indiana Lumbermens Mut. Ins. Co.*, 51 Kan. App. 2d 459, 490, 350 P.3d 1091 (2015); see *Thoroughbred Assoc. v. Kansas City Royalty Co.*, 58 Kan. App. 2d 306, 316-17, 469 P.3d 666 (2020); *J and B Oil & Gas v. Ace Energy*, No. 122,242, 2021 WL 3708002, at *9 (Kan. App. 2021) (unpublished opinion); *Sigg v. Sevart*, No. 118,631, 2019 WL 1213245, at *4-5 (Kan. App. 2019) (unpublished opinion). Since Nelson did not do that, the Court of Appeals' preservation rule suggests that we should not review the denial of his summary-judgment motion.

But we decline to apply that rule here. Ross has not suggested that Nelson's challenge is unpreserved for appeal. The panel below did not apply the rule. Nor has our court ever addressed this rule. And the United States Supreme Court caselaw that panels have drawn on continues to evolve. The first panel to apply the rule relied on *Ortiz v. Jordan*, 562 U.S. 180, 184, 131 S. Ct. 884, 178 L. Ed. 2d 703 (2011). See *Evergreen Recycle*, 51 Kan. App. 2d at 490. There, the Court held that a denial of summary judgment is not preserved for appellate review without a post-verdict motion for

26

judgment as a matter of law. The Court reasoned that "[o]nce the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion," and the issue "must be evaluated in light of the character and quality of the evidence received in court." *Ortiz*, 562 U.S. at 184. But in *Dupree v. Younger*, 598 U.S. 729, 736, 143 S. Ct. 1382, 215 L. Ed. 2d 636 (2023), the Court recognized that the same rationale does not apply to purely legal questions resolved at the summary-judgment stage because the question of law is not affected by future developments in the case. Even if we found this caselaw persuasive authority in interpreting our own preservation rules (as Court of Appeals panels have), the parties have not briefed this evolving caselaw. Nor have they addressed whether the right-to-farm issues involve factual determinations or are instead purely legal. Judicial restraint counsels us not to wade into those issues on our own initiative.

Of course, we would not have that discretion if the rule adopted by the Court of Appeals panels was jurisdictional. See *City of Shawnee v. Adem*, 314 Kan. 12, 14, 494 P.3d 134 (2021) (appellate court has duty to question jurisdiction on its own initiative). But it is not. K.S.A. 2023 Supp. 60-2102(a)(4) gives the Court of Appeals jurisdiction over an appeal from "[a] final decision in any action," and it expressly provides that "[i]n any appeal . . . from a final decision, any act or ruling from the beginning of the proceedings shall be reviewable." And we have subject-matter jurisdiction to review judgments of the Court of Appeals. See K.S.A. 60-2101(b). So the preservation issue does not divest the appellate court of jurisdiction to review a denial of summary judgment after a trial on the merits. Instead, the panels have simply recognized that in some cases, there may be prudential reasons for declining to do so. Even so, for these reasons we gave above, we will address Nelson's challenges on the merits.

B.   *Our Caselaw Does Not Shield Nelson from Nuisance Liability*

Nelson first seeks to shield his application of effluent from nuisance liability under our court's 1958 decision in *Dill*. In Nelson's view, *Dill* "established a legal principle that residents choosing to live in agricultural areas assume certain unavoidable inconveniences, including strong odors and fly infestations." He therefore argues that, as a matter of law, "applying animal waste to farm ground in a rural agricultural area" cannot "be an actionable nuisance as a result of producing smells that bother nearby residents." Nelson insists that any overruling of *Dill*'s common-law rule "should have only prospective effect." That is because "[s]ince *Dill*'s 1958 publication, farmers and feed yard owners have relied on the understanding that living in agricultural areas involves accepting inherent annoyances and odors." Ross did not file a brief in our court. But he insisted in his petition-for-review response that Nelson was "greatly overstat[ing] the import of *Dill*."

We agree with Ross. *Dill* did not create the broad protection from nuisance liability that Nelson claims. The "primary question" in *Dill* was "whether a cattle feeding operation carried on in a sparsely populated agricultural area of Sedgwick County constitutes a nuisance under all the facts, circumstances and conditions presented by the record." 183 Kan. at 514. *Dill* held that the case-specific facts did not support the district court's nuisance finding because, among other things, the feed lot was "'average kept,'" the injury was only an "occasional annoyance to any one individual," the feedlot was in an "area primarily agricultural with the exception of a few suburban tracts with homes," and the area had "been used for feeding livestock since 1924 with only occasional interruption." 183 Kan. at 524-26. So while the unavoidable inconveniences of agricultural settings were an important factor in the decision, *Dill* did not hold that those inconveniences were, as a matter of law, insufficient to create a nuisance.

28

Instead, *Dill* emphasized that "each nuisance case must stand upon its own particular facts and circumstances." 183 Kan. at 522. And in fact, Kansas appellate courts recognized odor-induced nuisance claims involving livestock in agricultural areas after *Dill*. See *State v. Johnson*, 196 Kan. 208, Syl. ¶ 1, 410 P.2d 423 (1966) (upholding criminal statute that prohibits creating a nuisance by maintaining unclean livestock building closer than 25 feet to another's dwelling); *Fields v. Anderson Cattle Co.,* 193 Kan. 558, 559-60, 396 P.2d 276 (1964) (jury verdict for plaintiffs in nuisance action against feedlot owners for noxious odors); *Finlay v. Finlay*, 18 Kan. App. 2d 479, 489, 856 P.2d 183 (1993) (right-to-farm statutes did not apply, so plaintiff's nuisance claim against cattle-feeding operation for noxious odors of feed and manure could proceed to trial).

Nelson's reading of *Dill* does not entitle him to relief. Thus, we turn to his arguments on the right-to-farm statutes.

C. *Nelson Did Not Establish that His Agricultural Practices Were Entitled to the Statutory Right-To-Farm Presumptions*

Nelson next contends that he is shielded from nuisance liability by K.S.A. 2-3202, one of the right-to-farm statutes. The right-to-farm statutes "provide agricultural activities conducted on farmland protection from nuisance lawsuits." K.S.A. 2-3201. To that end, K.S.A. 2-3202(a) creates a statutory presumption that "[a]gricultural activities . . . do not constitute a nuisance" when the statute's several requirements are met. To receive the benefit of that presumption, the nuisance must arise from an "agricultural activity." The activity must be conducted on "farmland." K.S.A. 2-3201. The activity must have been "established prior to surrounding agricultural or nonagricultural activities." And the activity must be "consistent with good agricultural practices." K.S.A. 2-3202(a). But the

29

statutory presumption is rebuttable. For even if those requirements are met, the presumption does not attach when "the activity has a substantial adverse effect on the public health and safety." K.S.A. 2-3202(a).

Another subsection of the statute, K.S.A. 2-3202(b), establishes another statutory presumption. Under that provision, an agricultural activity is "presumed to be [a] good agricultural practice"—which would satisfy one of the requirements described above—if it is "undertaken in conformity with federal, state, and local laws and rules and regulations." K.S.A. 2-3202(b). The district court's summary judgment ruling turned on this provision. The district court said Nelson was not entitled to this presumption because "his pipeline transporting the hog waste from the facility to the center pivot violates Kansas law by trespassing on Ross's property." In other words, Nelson's agricultural activity was not "undertaken in conformity with . . . state . . . laws." K.S.A. 2-3202(b).

Nelson challenges the district court's ruling (and the panel decision that affirmed it) on two grounds. First, he contends that an agricultural activity can still be "undertaken in conformity with federal, state, and local laws and rules and regulations" if it involves a trespass because that statutory language does not incorporate common-law torts. Second, he argues that K.S.A. 2-3202(b)'s presumption turns on whether the agricultural activity that occurred within the boundaries of the farmland was "undertaken in conformity" with the applicable laws. In other words, he believes the statute does not allow the court to consider whether upstream activities off the farmland complied with applicable laws. So even if the common law of torts is one of the applicable laws, Nelson argues a trespass that occurred off the farmland does not deprive him of right-to-farm protections for activities that occur on the farmland. As we explain below, we disagree on both counts.

But before turning to those discussions, we briefly note another subsection of the statute, K.S.A. 2-3202(c), which the Legislature added in 2013. See L. 2013, ch. 93, § 2. That provision allows owners of farmland to retain existing right-to-farm protections

30

even when expanding, changing, or temporarily ceasing or decreasing the scope of an agricultural activity. See K.S.A. 2-3202(c). At the Court of Appeals, the Kansas Livestock Association and Kansas Farm Bureau submitted a brief as amici curiae. They argued that subsection (c) better fit the facts here and, "[a]s a result, the district court analyzed the presumption under the wrong subsection of the statute, K.S.A. 2-3202(b)." But Nelson's summary-judgment filings in the district court never asserted that K.S.A. 2-3202(c) applied. Then during oral argument on his district-court motion, Nelson's counsel specifically asserted that subsection (c) did not apply. And most importantly, Nelson did not make this argument before the Court of Appeals, and he has not made it before us. See *In re Adoption of Baby Girl G.*, 311 Kan. 798, 803, 466 P.3d 1207 (2020) (issues not briefed are waived). As a result, we will not address the application of K.S.A. 2-3202(c) to this dispute.

1. *K.S.A. 2-3202(b)'s Presumption that an Agricultural Activity Is Consistent with Good Agricultural Practices if "Undertaken in Conformity with" State Law Includes the Kansas Common Law of Torts*

As we mentioned, under K.S.A. 2-3202(b), an agricultural activity is "presumed to be good agricultural practice" if it "is undertaken in conformity with federal, state, and local laws and rules and regulations." At the Court of Appeals, Nelson argued that "laws," "rules," and "regulations" are all "types of legislative regulatory controls." Nelson argues this language suggests that the Legislature did not intend the right-to-farm protections to turn on "whether the agricultural activity violates a third person's common-law rights." The panel rejected that argument. It held that general references to state law in Kansas include the common law. *Ross*, 63 Kan. App. 2d at 656.

We agree with the panel. In *State v. Dunn*, 304 Kan. 773, 788, 375 P.3d 332 (2016), our court recognized that state law includes "the Kansas Constitution, Kansas statute, or Kansas common law." Nelson does not address that caselaw in his briefing to our court.

31

Instead, he makes a textual inference based on the language of K.S.A. 2-3202(c)(1). The Legislature added this provision in 2013 to address changes in agricultural activities. Under that subsection, a landowner "[m]ay reasonably expand the scope of [the] agricultural activity . . . so long as [the] agricultural activity complies with all applicable local, state, and federal *environmental* codes, resolutions, laws and rules and regulations." (Emphasis added.) K.S.A. 2-3202(c)(1). In Nelson's view, the Legislature's use of the word "environmental" in (c)(1) shows that its focus is on compliance with environmental laws, rules, and regulations, not the common law. And he believes we should read K.S.A. 2-3202(b)'s presumption with that in mind. But the problem with that argument is that, even if Nelson correctly interprets (c)(1) as limited to environmental laws, the Legislature did not amend subsection (b) when it added subsection (c) in 2013. The textual dissimilarity in the two subsections suggests that the Legislature did not intend subsection (b) to have the same limitation.

Nelson also argues that the general reference to "federal, state, and local laws" in K.S.A. 2-3202(b) would typically encompass rules and regulations from those jurisdictions. And since that subsection then expressly references "rules and regulations," Nelson argues that reference to "laws" must encompass only legislative enactments, not the common law. See K.S.A. 2-3202(b) (good-agricultural-practice presumption applies when activity conforms to "federal, state, and local laws and rules and regulations"). To read the statute otherwise would create surplusage, he reasons. We note that in *Dunn*, we said only that state law includes the Kansas Constitution, statutes, and the common law, not "rules and regulations" too. *Dunn*, 304 Kan. at 788. And even if some surplusage exists, "the presence of some redundance is rarely fatal on its own to a statutory reading." *White v. United Airlines*, *Inc.*, 987 F.3d 616, 622 (7th Cir. 2021). Indeed, courts have expressed skepticism of rigid application of the anti-surplusage canon because legislatures often intentionally include redundant language. See, e.g., *Schutte v. Ciox Health, LLC*, 28 F.4th 850, 862-63 (7th Cir. 2022) (summarizing commentary from

32

courts, academics, and the scholarly work of federal judges). Given our precedent recognizing Kansas common law as "state law," we are not convinced that some surplusage would make Nelson's reading of the statute more accurate.

2. *The Lower Courts Did Not Err by Considering Nelson's Trespass when Determining that His Agricultural Activity Did Not Conform to State Law*

Nelson's second challenge to the district court's denial of summary judgment involves the scope of the right-to-farm protections. He contends that when courts evaluate whether an agricultural activity "is undertaken in conformity with federal, state, and local laws and rules and regulations," they must look only to activities conducted within the territorial boundaries of the farmland. See K.S.A. 2-3202(b). Nelson points to the statutory text for support. He notes that K.S.A. 2-3202(a) provides nuisance protections for "[a]gricultural activities conducted *on farmland*." (Emphasis added.) Under his view, even if that statutory language incorporates the Kansas common law of torts, and even if Nelson's pipelines trespassed on Ross' land, he is still entitled to the good-agricultural-practices presumption in K.S.A. 2-3202(b) because that trespass did not occur within the boundaries of the farmland. The district court and panel rejected this argument. See *Ross*, 63 Kan. App. 2d at 657-59.

We first note that the Legislature has defined "agricultural activity" in the right-to-farm statutes to include activities that often occur outside the farmland. See K.S.A. 2-3203(a) ("'Agricultural activity' . . . includes activities related to the handling, storage and transportation of agricultural commodities."). But even if we assume that Nelson has properly interpreted the scope of K.S.A. 2-3202(b)'s good-agricultural-practices presumption, we disagree that he is entitled to that presumption under the facts here.

Nelson developed a physically interconnected irrigation system that pipes water from his farmland to his hog-confinement facilities. The system also pipes effluent from the facilities' holding pond back to the center-pivot sprayers on his farmland. The effluent pipes travel through Ross' property and onto Nelson's farmland. There, the pipes eventually connect to a central distribution point that pushes the effluent to the center-pivot sprayers. Because this interconnected system is located, in part, on the farmland, and because its function and utility are realized on the farmland, it is appropriate for courts to consider whether this integrated system conforms to the applicable law. This is true even though portions of the integrated system are located outside the farmland. As the panel put it, Nelson's application of the fertilizer "was made possible by the infrastructure he installed to transport that effluent from the hog farm," and under the facts here, "the application and infrastructure that enabled it are logically indistinguishable." 63 Kan. App. 2d at 658.

We agree with the district court and panel that Nelson's agricultural activity failed to conform to state law. As such, he is not entitled to K.S.A. 2-3202(b)'s presumption that he was engaging in good agricultural practices. And because Nelson did not otherwise seek to establish that he was engaging in good agricultural practices, he is not entitled to K.S.A. 2-3202(a)'s statutory presumption that his agricultural activity was not a nuisance. We therefore affirm the Court of Appeals' decision affirming the district court's judgment.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.